In re CHARTER TECHNOLOGIES, INC., d/b/a Elgin Electronics, Debtor.

CHARTER TECHNOLOGIES, INC. d/b/a Elgin Electronics, Plaintiff,

v.

KNOX, McLAUGHLIN, GORNALL & SENNETT, P.C. and Guy C. Fustine, Defendants.

Fellheimer, Eichen & Braverman, P.C., Applicant.

Charter Technologies, Inc. d/b/a Elgin Electronics, Inc., Movant.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS, Movant,

v.

CHARTER TECHNOLOGIES, INC. d/b/a Elgin Electronics, Inc., Respondent.

Bankruptcy No. 93–10042.
Adv. No. 93–1286.
Motion Nos. FEB–17, FER–1 and RAL–2.

United States Bankruptcy Court, W.D. Pennsylvania.

Nov. 2, 1993.

Richard A. Lanzillo, and Guy C. Fustine, Erie, PA, for Official Committee of Unsecured Creditors.

Alan Fellheimer, and Jeffrey L. Eichen, Philadelphia, PA, for debtor.

Stephen D. Lerner, Cincinnati, OH, for Star Bank.

United States Trustee, Pittsburgh, PA.

## OPINION

WARREN W. BENTZ, Bankruptcy Judge.

### Introduction

Charter Technologies, Inc. d/b/a Elgin Electronics ("Debtor") filed a voluntary Petition under Chapter 11 of the Bankruptcy Code on January 20, 1993. Fellheimer, Eichen & Braverman, P.C. are attorneys for the Debtor.

On June 28, 1993, the Debtor, through its attorneys, filed an Adversary Complaint ("Complaint") at Adversary No. 93–1286 seeking $4.25 million in damages and a Motion for Preliminary Injunction ("Motion") against the law firm of Knox, McLaughlin, Gornall & Sennett, P.C. ("Knox Firm") and Guy C. Fustine ("Fustine"), the attorneys retained by the Official Committee of Unsecured Creditors ("Committee"). The Com-

plaint and Motion were signed by Jeffrey L. Eichen, Esq. on behalf of Fellheimer, Eichen & Braverman, P.C.

With the Debtor and the Committee on opposite sides of a personal lawsuit arising in the Chapter 11 proceeding, the case was at a standstill. Because the case was at a standstill and because of the serious nature of the allegations of misconduct, the Court treated the Complaint and Motion as an emergency matter. We fixed an immediate hearing for July 8, 1993. On July 6, 1993, Alan S. Fellheimer, Esq. ("Fellheimer") of Fellheimer, Eichen & Braverman, P.C. advised the Court's Clerk that the hearing could not proceed as scheduled on July 8, 1993 because the key testimony would be that of the Debtor's President and principal stockholder, Joseph J. Burke ("Burke"), who would be out of the country on July 8, 1993. The hearing was postponed until August 3, 1993.

On July 19, 1993, the Debtor filed a Motion to Postpone the August 3 date or, in the alternative, to postpone the testimony of Vito Casoni ("Casoni"). The Debtor alleged that it would be able to proceed on August 3, 1993 only if the Debtor were permitted to introduce an Affidavit of Casoni on August 3, 1993 and to examine Casoni under oath at a continued hearing. The Court agreed to hear argument at the conclusion of the testimony on August 3, 1993 as to whether another date should be fixed to hear Casoni's testimony.

The Debtor next filed, on July 22, 1993, a Motion to Disqualify Defendants from Acting as Legal Counsel to Witnesses ("Motion to Disqualify"). The premise of this Motion to Disqualify was that by representing individual members of the Committee, the Knox Firm and Fustine, who might be found liable in this proceeding, had a conflict of interest. At paragraph 10 of the Motion to Disqualify, Debtor's counsel states:

> 10. On or about July 16, 1993, the Knox firm sent a letter to counsel to Charter affirming that Fustine and the Knox firm were continuing to represent the Committee *and its constituent members* in the adversary proceeding between Charter and Fustine and the Knox firm ... (emphasis added).

Our review of the Knox Firm's July 16, 1993 letter quickly revealed the Debtor's counsel's misrepresentation of the contents of the July 16 letter. The letter specifically states:

Finally, to ensure that there is no further confusion in this matter, be advised that Fustine and the Knox Firm continue to represent the Committee, as they have since February of 1993. *Fustine and the Knox Firm do not represent any individual member of the Committee.* (emphasis added)

The gravamen of the Motion to Disqualify was that since Fustine and the Knox Firm were defendants in the Complaint, they should be ipso facto removed from the case. We declined to do so and reiterated that the hearing would go forward on August 3, 1993.

Trial commenced at 9:30 a.m. on August 3, 1993. Casoni's Affidavit was introduced during the hearing. At the conclusion of the first full day of trial, counsel for the Debtor orally withdrew the Complaint and Motion. The Motion for Sanctions presently before the Court was specifically left open and unresolved.

After an evidentiary hearing on the Motion for Sanctions and upon consideration of the pleadings, briefs, testimony of August 3, 1993, and the Affidavits submitted in connection with the within Adversary Proceeding, we find that the Debtor's Complaint and Motion assert numerous allegations which lack any reasonable basis and that counsel for the Debtor either knew or upon the slightest investigation would have known that the Debtor's claims were factually baseless. Sanctions are appropriate.

### Jurisdiction

We have jurisdiction to hear these matters under 28 U.S.C. § 1334, 28 U.S.C. § 157(b) and the Order of Reference in effect in the Western District of Pennsylvania. The matters pending before the Court are core proceedings under 28 U.S.C. § 157(b)(2).

### Allegations

The allegations in the Complaint and Motion include the following:

(a) At a meeting held on May 20, 1993, Fustine and the Knox Firm acted as legal counsel for and negotiated on behalf of individual Committee members.

(b) Fustine and the Knox Firm were not authorized to disseminate a June 4, 1993 letter and the June 4 letter did not represent the opinion or position of the Committee.

(c) A letter disseminated by Fustine and the Knox Firm on June 16, 1993 makes the following false and misleading statements about the Debtor, its finances and its management:

(i) the Debtor's accumulated total loss before income taxes is $1.6 million since October 1989.

(ii) the Debtor has paid $315,000 in stock dividends since 1990.

(d) Fustine breached an agreement not to meet with potential investors interested in the Debtor.

(e) As a result of statements by Fustine and the Knox Firm, SMG Control Systems lowered its bid for the Debtor's equity.

(f) Fustine caused Kulicke & Soffa Industries, Inc. ("K & S"), one of the Debtor's largest customers, to retract business from the Debtor.

### Discussion

### I. The Allegations are Factually Baseless

The evidence establishing that Fustine and the Knox Firm represented the Committee, and only the Committee, is overwhelming. Fustine and every member of the Committee has submitted an Affidavit attesting to this fact. The Debtor failed to present any evidence that Fustine and the Knox Firm represented any individual member of the Committee.

The Debtor identifies a May 20, 1993 meeting as the occasion where Fustine and the Knox Firm allegedly represented individual members of the Committee. Burke was advised of the meeting by his counsel and was advised that the purpose of the meeting was to meet with the Committee; that REM Electronics and Advacom, Inc. wanted to purchase the Debtor. Present at the meet-

ing were Burke and Fellheimer on behalf of the Debtor and Richard P. Cowin, Robert C. Miller, Thomas A. Calicchio, and Fustine on behalf of the Committee. Mr. Cowin is the Chairman of the Committee. He and Mr. Miller are employed by REM Electronics, a member of the Committee. Mr. Calicchio is employed by Advacom, Inc., another member of the Committee.

The evidence is clear that this meeting took place in the context of a continuing effort on behalf of the Committee to formulate a plan of reorganization acceptable to the Debtor and its creditors.

During the meeting, Fustine and the other Committee members advised Burke and Fellheimer of REM Electronics and Advacom Inc.'s interest in investing in the Debtor. There is no evidence to suggest that Fustine acted as legal counsel to REM Electronics or Advacom, Inc. or to suggest that such discussions were not in contemplation of a plan of reorganization which would include all unsecured creditors.

During the meeting, Fustine and the Committee members advised Burke and Fellheimer that any plan which did not provide for substantial payment to creditors up front would have to provide for Burke's replacement at top-level management to attain the Committee's support.

As the evidence makes clear, this revelation was quite disturbing to Burke. The evidence is also clear that Fustine did nothing more than communicate the position of the Committee with respect to Burke and possible plans of reorganization. The allegation that Fustine and the Knox Firm represented certain individual members of the Committee and breached their duty to the unsecured creditors lacks any hint of a reasonable basis.

In the Complaint and in Burke's Affidavit, it is stated that immediately after Fustine and the Knox Firm disseminated the June 4th letter, Burke received two calls from members of the Committee, Robert E. Miller and Frank Slurkanich. The Complaint alleges that both of these Committee members stated that Fustine and the Knox Firm were not authorized to send the June 4th letter

and that it does not represent the position or opinion of the Committee.

The thrust of the June 4th letter was that there were problems with management and that Burke should be replaced. The overwhelming evidence supports the fact that the language of the June 4th letter accurately reflected the Committee's position.

As of March 20, 1993, the Committee had access to a draft of a report ("E & Y Report") prepared by Ernst & Young, a nationally known accounting firm, for a potential investor. The E & Y Report identified numerous management deficiencies from which it would have been reasonable for the Committee to determine the need to replace Burke. Yet, as of August 3, 1993, Burke asserted that he did not believe that the Committee felt he should be removed from management, even in the face of Affidavits from each member of the Committee which adopt this position.

More troublesome, are the blatantly false statements of Burke and the Debtor that Burke received a telephone call from Frank Slurkanich immediately after dissemination of the June 4th letter and that Slurkanich stated that Fustine and the Knox Firm were not authorized to send the June 4th letter.

In fact, Burke never took a call from Slurkanich. Burke's secretary spoke to Slurkanich. Slurkanich never stated that the letter was unauthorized, only that he did not "put out" the letter. Further, Slurkanich did not call in response to the June 4th letter, but rather in response to a notice of termination as a sales representative which Slurkanich received from Burke on June 7, 1993, which Burke had issued in retaliation for the Committee's June 4th letter!

In other words, Burke fired Slurkanich as Debtor's sales representative, as punishment for being on the Creditors' Committee which criticized Burke's management skills.

Even if the Committee's view had been in error, Burke's response was childish at best and incompetent at worst. Nothing could have solidified the Committee and its position more than this erratic tactic by Burke.

Moreover, there is a complete lack of evidence that Fustine and the Knox Firm were

not authorized to prepare the June 4th letter and that the letter did not accurately reflect the views of the Committee.

The Complaint alleges that Fustine defamed the Debtor by falsely stating that the Debtor's accumulated total loss before income taxes is $1.6 million since October, 1989. If counsel for the Debtor had reviewed the Debtor's own financial statements for the years 1990, 1991, and 1992, it would have known this statement was true and accurate. Burke testified that the statement was true for the three fiscal years. Burke attempted to explain that the loss had decreased since the bankruptcy was filed, however, he further admitted that profit/loss figures during the bankruptcy do not include all of the expenses, in particular, the administration costs which will likely amount to several hundred thousand dollars.

The Complaint alleges that Fustine defamed the Debtor by falsely stating that the Debtor has paid $315,000 in stock dividends since 1990. If Debtor's counsel had reviewed the Debtor's own financial information, counsel would have readily determined that the financial information shows dividends of $105,000 for each of the years 1990, 1991 and 1992. Burke testified that this was a setoff against interest income, but the statements nevertheless reflect payment of $315,000 in dividends.

The Complaint alleges that Fustine breached an agreement he made with Fellheimer not to meet with potential investors in the Debtor. There is absolutely no evidence to support this allegation. Burke repeats this allegation in his Affidavit. Under cross-examination, Burke admitted he had no first-hand knowledge of such an agreement or whether or not such an agreement was breached.

Fustine allegedly breached such agreement by meeting with Casoni on May 20, 1993. From Fellheimer's Application for Fees & Expenses, it appears that the first time any agreement was even discussed was May 21, 1993, after the alleged breach occurred.

The Complaint alleges that statements Fustine made to Casoni of SMG Control caused SMG Control to substantially reduce its bid for the Debtor. At trial, the Debtor submitted an Affidavit of Casoni of SMG Control. The Affidavit clearly states that Fustine's comments "did not alter SMG's offer as to price." Debtor's counsel has always had access to Casoni. Had Debtor's counsel merely contacted Casoni prior to filing the Complaint, it would have known the allegation was factually baseless.

Finally, the Complaint alleges that Fustine caused K & S to withdraw its business from the Debtor. An Affidavit prepared by Mr. Jim King of K & S states:

"I have personally reviewed the affidavit of Joseph J. Burke dated June 26th, 1993. In paragraphs fourteen—eighteen of his affidavit Mr. Burke indicates that Kulicke & Soffa has retracted its business with the debtor as a result of statements made by Attorney Fustine in his letter of June 4th, 1993. Mr. Burke's attempt to imply that Attorney Fustine somehow prompted Kulicke & Soffa's retraction of business with the debtor is absolutely false. To the contrary, Kulicke & Soffa has retracted business from the debtor as a result of the debtor's inability to fulfill Kulicke & Soffa's production schedule on time and serious problems we perceive in the debtor's quality and recycling procedure. In fact, due to Kulicke & Soffa's lack of confidence in the debtor's ability to meet needs, Kulicke & Soffa has had several employees working fulltime at the debtor's facility to monitor the process and help the debtor in purchasing in an operational standpoint. Attorney Fustine's correspondence had nothing whatsoever to do with Kulicke & Soffa's opinions and business relationship with the debtor and Mr. Burke."

In fact, Burke admits in his testimony that other reasons exist which may have caused apprehension on the part of K & S, including problems with timely deliveries and quality.

Neither Burke nor Debtor's counsel called K & S prior to making such serious allegations to determine the veracity of the allegations.

We feel compelled to accentuate one further point. We originally scheduled a hearing on this matter for July 8, 1993. On July

6, 1993, Fellheimer advised the Court's Clerk that the hearing could not go forward on July 8 because Burke, the key witness in this matter, was in England. At trial, Burke testified that he was available on July 8 and had been in England the prior week. Debtor's counsel stated emphatically that he didn't know; that he thought Burke was in England.

On August 25, 1993, Debtor's counsel filed its Application for interim compensation and reimbursement of expenses. From that Application, we derive the following information:

On July 6, 1993, in addition to contacting the Court, Fellheimer had a telephone conversation with Burke at his office regarding the within adversary proceeding. In total, Debtor's counsel's office made six calls to the Debtor corporation on July 6, 1993 and two calls to the Court.

There is no rational basis favorable to Fellheimer as to why he would represent to the Court on July 6 that he thought Burke was in England and unavailable for the scheduled hearing on July 8.

### Sanctions

Fed.R.Bankr.P. 9011 provides in pertinent part:

> The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass, or to cause unnecessary delay, or to needless increase in the cost of litigation or administration of the case.

Fed.R.Bankr.P. 9011 tracks Fed.R.Civ.P. 11. Upon consideration of the requirements of Fed.R.Civ.P. 11, the Court of Appeals for the Third Circuit has stated:

> Rule 11 imposes on any party who signs a document submitted to the court an affirmative duty to conduct a reasonable inquiry into the facts and law before filing.

*Business Guides, Inc. v. Chromatic Communications Enter.* [498 U.S. 533, 543–44], 111 S.Ct. 922, 929 [112 L.Ed.2d 1140] (1991). The presence of a signature obligates the signer to certify that he or she has conducted a reasonable inquiry and has determined that any papers filed with the court are factually well-grounded. *Lony* [v. *E.I. DuPont de Nemours & Co.*], 935 F.2d [604] at 616 (citations omitted). The objective standard imposed by Rule 11 is firmly established in this circuit. We have consistently noted that the Rule 11 test is "now an objective one of reasonableness" which seeks to discourage pleadings "without factual foundation, even though the paper was not filed in subjective bad faith." *Lony,* 935 F.2d at 616; *see also Lieb v. Topstone Indus.,* 788 F.2d 151, 157 (3d Cir.1986). We have also said that Rule 11 is designed to ensure that pleadings are not used for improper purposes such as harassment, delay or needless increase in litigation expense. *Lony,* 935 F.2d at 616; *Lieb,* 788 F.2d at 157. When a district court examines the sufficiency of the investigation of facts and law, it "is expected to avoid the wisdom of hindsight and should test the signer's conduct by [asking] what was reasonable to believe at the time the pleading, motion, or other paper was submitted." *CTC Imports and Exports v. Nigerian Petroleum Corp.,* 951 F.2d 573, 578 (3d Cir.1991) (citing Notes of Advisory Committee on Rules, 1983 Amendment, Fed.R.Civ.P. 11). In doing so, the court must consider all circumstances surrounding the submission, *CTC Imports and Exports,* 951 F.2d at 578, including the amount of time the signer had to investigate, whether the signing attorney had to rely on a client for information as to the facts, and whether the signer depended on prior counsel or another member of the bar if the case has been transferred. Advisory Committee Note, 97 F.R.D. [195] at 199.

*Bradgate Associates, Inc. v. Fellows, Read & Associates, Inc.,* 999 F.2d 745 (3d Cir.1993).

 In this case, Debtor's counsel has failed to satisfy these requirements. Debtor's counsel failed to make any reasonable

inquiry into the underlying facts before filing the within Complaint. Debtor's counsel knew or should have known that many of the allegations were baseless without any inquiry. A quick review of the Debtor's financial information would have shown certain of the allegations to be without merit. A telephone call would have sufficed to determine the fruitlessness of other assertions.

Fellheimer testified that his firm researched the various causes of action prior to preparation of the Complaint. Yet, Fellheimer's Fee Application reflects no time or charge for such research. It is not believable that, as Fellheimer testified, they just didn't charge for that time.

The assertions and arguments advocated by Debtor's counsel were beyond the limits of reasonableness. We further question the purpose of the Complaint. The conclusion is inescapable that the purpose of the Complaint was to separate the Committee from its chosen counsel due to the fact that counsel for the Committee was advocating the Committee's position that it would be appropriate to remove Burke from upper-level management.

Burke testified that at the May 20 meeting, when it was made clear that the Committee viewed Burke as lacking in management skills, the question was raised as to what it would take to get Burke to resign. Burke and Fellheimer then stepped out to discuss the matter in private and then returned with a demand which the Committee declined. At that point, it is apparent that Fellheimer had abandoned his fiduciary obligations as counsel to the Debtor corporation and had undertaken representation of Burke, individually. As Burke's attorney in such circumstances, he was hostile to the Debtor corporation and its creditors.

We recognize that a lawyer may "slip up" in a close corporation and, in an effort to reach a multi-party agreement, forget who he is really representing.

But Fellheimer went further, beyond, in our view, any limits of forgivable oversight. In order to protect his real client, Burke, he brought a $4.25 million lawsuit against the lawyers for the Committee.

In short, Fellheimer filed a lawsuit against the attorneys for the Creditors' Committee seeking $4.25 million in damages for the sole purpose of protecting his real client, Burke, from the legitimate actions of the Creditors' Committee in opposing Burke's management of the Debtor's business. It may be that the Defendants, the Knox Firm and Fustine, recognized the allegations as being without a factual foundation and therefore the lawsuit was not a cause of concern other than the extensive amount of investigation and trial work necessary in order to make sure that all the facts were before the Court. However, we might conjecture that some lawyers, upon being named a defendant in a $4.25 million lawsuit brought by an impressive Philadelphia law firm, might not have had the intestinal fortitude to fight it out—they might have yielded and compromised with the illegitimate purposes sought to be obtained by Fellheimer. Viewed in this light, the actions of Fellheimer as an officer of the Court in violating his fiduciary duties and in bringing such an action are absolutely not to be condoned. We view it as a disgrace to the legal community which we otherwise hold in high regard.

We further conclude that Fellheimer never had any intent to proceed with a trial on the merits of this complaint. He knew when he filed the Complaint that the allegations were unsupported. His scheme was to file the Complaint, demand the $4.25 million from the Creditors' Committee counsel, and then delay a hearing on the merits while he used the lawsuit as a wedge to intimidate the Creditors' Committee and its counsel in his negotiations with it for the benefit of Burke. This explains Fellheimer's untruthful statements to this Court's Clerk on July 6th that Burke was out of the country and would not be available for the evidentiary hearing scheduled for July 8th. When Fellheimer's Complaint was filed, it was accompanied by a Motion for Preliminary Injunction bringing it to the attention of the Court. The Court immediately saw it as a deadlock to any further negotiations on a plan of reorganization. The Court also considered that if there were any factual support for the serious allegations of the Complaint, the Creditors'

Committee counsel should be removed and that if there were any such factual support, a prima facie case could be quickly made out by the plaintiff. Thus, we attempted to schedule a quick evidentiary hearing. Fellheimer's purpose was to the contrary. His effort was to stall the evidentiary hearing, to keep the Complaint alive and use it as leverage for his own improper purposes in representing Burke individually. That illicit purpose plus the total lack of any evidentiary basis for the serious accusations made in the Complaint cry out for judicial recognition and appropriate sanction.

Further evidence as to the identity of Fellheimer's real client is expressed in the Debtor's proposed plan of reorganization filed on August 23, 1993. The Plan provides for forgiveness of Burke's personal guarantees to certain creditors.

Perhaps some of Fellheimer's comments best summarize the inappropriateness of the Complaint. Fellheimer states that the Complaint was a bit overdone; that the Complaint has problems with it; that it was a mistake and an overreaction. Fellheimer further states that he has sanctioned himself by relinquishing his request for fees in connection with this Adversary Proceeding.

As Fellheimer stated at the hearing held on October 20, 1993:

I thought we made an investigation. There is a certain amount of res ipsa loquitur. And that is if I had known more, perhaps it would have come out better. And obviously this—I can't think of something that has gone much worse than this has. I'll have to be honest and tell you that. And if I had it to do over again, I would do it differently. I've testified to that on the stand and I'm saying that to you.

And I don't want to leave here with you having the—anything from us but the impression that we wish it had gone differently or we wish we had done it differently. It obviously was not successful. It didn't do well for the debtor, and for that I apologize. And if it alienated the committee, I was wrong for that. I apologize to this Court. And whatever this Court decides should be done about it, I have to

accept. My motives were, I thought at the time, honorable. I was concerned about— I met with Mr. Casoni. I did do more investigation. I met with Mr. Casoni. We have affidavits from Mr. Burke. But the end result of it was disastrous, and I acknowledge that. And I want to acknowledge that to the Court. It did create a problem and it's been an unpleasant situation.

I have been searching in vain for a way to stop it or to get away from it. I want to tell the Court. I don't want this Court to think that I'm standing here, that I believe what happened was right. I believe it was wrong. If I had it to do over again, I would do it differently. And I can promise you, whatever you decide to do, it won't happen again. I would approach it differently and I would make sure my firm approaches it differently. I'm very unhappy with the way it came out. I will tell you that there were a lot better ways to resolve that problem than the one we selected. And I want to acknowledge that to you and admit that to Your Honor and admit to Your Honor that the result was bad. For that I apologize.

Your Honor told me what he thought of it at the time when we withdrew it. And I bear full responsibility for it, Your Honor. I'll end with that. If there's some way to just resolve it, I would like to not carry it forward again and again and again. I think if it's hurting the debtor, I would rather my firm withdrew from this case, to allow other counsel to come in who was not suffering under this. It's not good for the debtor, if this cannot be resolved somehow so that we can get on with it.

It will be ordered that Fellheimer's retainer be disgorged, that he be allowed no fees in the within bankruptcy proceeding and that any fees to be collected by him shall be collected from his real client, Burke.

■ Since Fellheimer, Eichen & Braverman, P.C. is receiving no compensation from this case, we will not direct it to pay the fees and expenses of other professionals and members of the Committee incurred in the

defense of the Complaint. Those expenses will be borne by the Debtor.

The sanctions imposed by Fellheimer upon himself—requesting no fees in connection with this Adversary Proceeding—are insufficient. Fellheimer's inappropriate conduct affected and continues to affect this entire case. Both the Debtor and its counsel have exhibited conduct of dishonesty, incompetency and gross mismanagement of the affairs of the Debtor. The Committee having now filed a motion for the appointment of a Chapter 11 Trustee, that motion will be granted.

An appropriate Order will be entered.

### ORDER

This 2 day of November, 1993, in accordance with the accompanying Opinion, it shall be, and hereby is, ORDERED as follows:

1. Fellheimer, Eichen & Braverman, P.C. is allowed no fees in this bankruptcy case.

2. Fellheimer, Eichen & Braverman, P.C. is allowed $15,000 for reimbursement of expenses.

3. Fellheimer, Eichen & Braverman, P.C. shall disgorge to the Debtor the retainer and any other payments it received in this case, less the allowed amount of $15,000 in expenses.

4. The Motion of the Official Committee of Unsecured Creditors for the Appointment of a Chapter 11 Trustee is GRANTED. The office of the United States Trustee is directed to appoint a Chapter 11 Trustee forthwith.

5. The Motion of the Official Committee of Unsecured Creditors for Clarification and Reconsideration of Memorandum and Order dated February 26, 1993 is REFUSED as moot, to be reopened and hearing held upon request.