

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-22-1995

# Fellheimer v Charter Tech

Precedential or Non-Precedential:

Docket 94-3461

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Fellheimer v Charter Tech" (1995). *1995 Decisions*. Paper 171.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/171

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
------------
No. 94-3461
------------


FELLHEIMER, EICHEN & BRAVERMAN, P.C.,

v.

CHARTER TECHNOLOGIES, INCORPORATED,
d.b.a. ELGIN ELECTRONICS;
KNOX, McLAUGHLIN, GORNALL & SENNETT, P.C.;
and GUY C. FUSTINE, ESQUIRE,

Fellheimer, Eichen, Braverman
and Kaskey, P.C.,
Appellants

----------------------------------------------------------
On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Civ. No. 93-345E)
----------------------------------------------------------


Argued:  March 7, 1995

Before:  BECKER, SCIRICA, and
WOOD, JR.,[*] Circuit Judges

(Filed:  June 22, 1995)

DAVID L. BRAVERMAN, ESQUIRE (ARGUED)
MAIA CAPLAN, ESQUIRE
KENNETH S. GOODKIND, ESQUIRE
MATTHEW A. NYMAN, ESQUIRE
W. THOMAS TITHER, ESQUIRE
2100 One Liberty Place
Philadelphia, PA  19103

Attorneys for Appellant

GUY C. FUSTINE, ESQUIRE
RICHARD A. LANZILLO, ESQUIRE (ARGUED)
120 West Tenth Street
Erie, PA  16501

---

[*]  The Honorable Harlington Wood, Jr., United States Circuit
Judge for the Seventh Circuit, sitting by designation.

---------------------------
OPINION OF THE COURT
---------------------------

WOOD, JR., Circuit Judge.

Fellheimer, Eichen & Braverman, P.C. ("FE&B") appeals the denial of its entire fees application. The bankruptcy court found that during the course of FE&B's representation of Charter Technologies, Incorporated, d.b.a. Elgin Electronics ("the Debtor"), in the context of the Debtor's Chapter 11 proceedings, that FE&B had wrongfully represented the interests of the Debtor's president and principal shareholder, Joseph Burke. The bankruptcy court found that FE&B had sought to further Mr. Burke's interests over the interests of the Debtor by, among other things, filing a patently false $4,250,000 lawsuit against the counsel to the Official Committee of Unsecured Creditors, and by making repeated and knowing misrepresentations to the bankruptcy court. The bankruptcy court further found that FE&B was motivated throughout its representation of the Debtor by subjective bad faith. Consequently, the bankruptcy court sanctioned FE&B by denying its fees application in its entirety. On appeal, the district court upheld the denial of FE&B's fees application. The district court did, however, substitute its own justifications for the bankruptcy court's action. Because we feel that the bankruptcy court's factual findings are not clearly erroneous, and because we find the district court's

justifications for the sanctions to be acceptable, we affirm the denial of FE&B's entire fees application.

## I. BACKGROUND

On January 20, 1993, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The Debtor also filed a motion at this time to employ FE&B as its counsel. On February 17, 1993, the bankruptcy court conducted a hearing regarding the employment of FE&B. Based, in part, on the testimony of Alan Fellheimer that FE&B would seek to file a reorganization plan for the Debtor between March 15 and March 30, 1993, and that FE&B had "already arranged . . . a significant equity infusion into the company, seven figure infusion, a million dollars," the bankruptcy court approved the employment of FE&B.

Despite these confident assertions, neither a reorganization plan nor a large equity infusion was forthcoming by the end of March 1993, and a meeting was subsequently arranged to discuss the future of the Debtor. This meeting, which took place on May 20, 1993, was attended by Mr. Fellheimer; Mr. Burke; Guy Fustine of Knox, McLaughlin, Gornall & Sennett, P.C. ("the Knox Firm"), counsel to the Official Committee of Unsecured Creditors ("the Committee"); and certain representatives of the Committee. The representatives of the Committee indicated that the Committee was willing to work with the Debtor to solve its financial woes, to wit, the Committee would be willing to accept a plan in which the unsecured creditors as a whole exchanged debt for equity, or a plan in which two members of the Committee--REM Electronics and

Advacom, Incorporated--would extend credit to the Debtor or invest cash in the Debtor.

The representatives of the Committee also made it clear that they lacked confidence in the managerial skills of Mr. Burke: If the Debtor's reorganization plan was hinged upon the long-term viability of the Debtor, the Committee pledged to withhold its support unless the Debtor's top-level management was replaced-- particularly Mr. Burke. At this point, Mr. Burke and Mr. Fellheimer left the meeting to confer privately. Upon their return, Mr. Fellheimer presented the representatives of the Committee with Mr. Burke's demands. According to Mr. Fellheimer, Mr. Burke would agree to leave the management of the Debtor only if the reorganization plan provided him with: (1) a written employment contract with the Debtor; (2) an equity position in the Debtor; and (3) a release from the personal guarantees Mr. Burke had previously executed which secured certain obligations of the Debtor.

Following this meeting, in a letter dated June 4, 1993, Mr. Fustine reiterated the Committee's views regarding Mr. Burke's long-term future in the Debtor's management.[1] In response, in

_____

[1] In the June 4th letter, Mr. Fustine stated that

> [t]he position of the Committee with respect to Joe Burke is clear. It will not accept any Plan of Reorganization which provides for payments over time or which provides for the conversion of debt to equity if the Plan also provides that Joe Burke will continue in a management role. Joe Burke is believed to be a part of the problem and not a part of the cure. I am telling you this again now so that there is no confusion in the future.

letters dated June 8 and June 14, 1993, Mr. Fellheimer charged Mr. Fustine with representing individual members of the Committee and demanded that the Knox Firm withdraw as counsel to the Committee and, moreover, that certain members of the Committee also withdraw from the Committee. Mr. Fellheimer furthermore threatened to file a motion with the bankruptcy court seeking the dismissal of the Knox Firm if the Knox Firm did not voluntarily withdraw. Mr. Fustine and the Knox Firm responded by again restating the position of the Committee in a letter to FE&B dated June 16, 1993. That same day, Mr. Fustine and the Knox Firm also filed a motion on behalf of the Committee to ratify the appointment of Mr. Fustine and the Knox Firm as the Committee's counsel.

FE&B filed the Debtor's response to the Committee's motion to ratify its counsel on June 28, 1993. FE&B also filed a seven-count complaint on behalf of the Debtor against Mr. Fustine and the Knox Firm seeking $4,250,000 in damages and a preliminary injunction to prevent Mr. Fustine and the Knox Firm from representing the Committee ("the complaint"). The complaint made the following allegations: Count One charged Mr. Fustine and the Knox Firm with breaching their fiduciary duty to the Committee by representing individual members of the Committee; Counts Two and Three charged Mr. Fustine and the Knox Firm with breaching a contract that they had allegedly entered into with the Debtor which required them to refrain from communicating with potential investors in the Debtor; Counts Four and Five charged Mr. Fustine and the Knox Firm with libeling and slandering the Debtor in

their letters of June 4 and June 16, 1993; Count Six charged Mr. Fustine and the Knox Firm with intentionally and negligently interfering with the Debtor's existing and prospective contractual relations; and Count Seven charged Mr. Fustine and the Knox Firm with unfairly competing with the Debtor by representing individual members of the Committee. The complaint was signed by Jeffrey Eichen of FE&B.

Viewing the complaint as an insurmountable barrier to a successful reorganization effort, the bankruptcy court quickly scheduled a hearing for July 8, 1993. Mr. Fellheimer telephoned the court on July 6, 1993, however, and requested that the hearing be rescheduled as Mr. Burke--whose testimony Mr. Fellheimer characterized as essential to the complaint--was out of the country and would not return before the hearing. The bankruptcy court consequently rescheduled the hearing for August 3, 1993. In fact, Mr. Burke was not out of the country and Mr. Fellheimer was aware of Mr. Burke's actual whereabouts on the same day--July 6, 1993--that he telephoned the bankruptcy court. On July 19, 1993, FE&B again sought to delay the hearing by filing a motion to postpone the hearing. In this motion, FE&B asserted that Vito Casoni, another allegedly essential witness, would be unavailable on the new date of the hearing. The bankruptcy court, however, refused to further reschedule the hearing.

On July 20, 1993, the Knox Firm, Mr. Fustine, and the Committee filed a Motion for Sanctions Pursuant to Bankruptcy

Rule 9011 and Rule 11 of the Federal Rule of Civil Procedure[2] against FE&B ("the sanction motion").  The sanction motion alleged that sanctions were appropriate in that the complaint filed by FE&B lacked a reasonable basis in law and in fact and that the complaint was filed for improper tactical purposes.

In one last salvo before the hearing, FE&B filed a Motion to Disqualify Defendants from Acting as Legal Counsel to Witnesses ("motion to disqualify").  The motion to disqualify alleged that Mr. Fustine and the Knox Firm suffered from an irreconcilable conflict of interests due to their representation of individual members of the Committee and due to their status as parties and material witnesses in the litigation on the complaint.

On August 3, 1993, the hearing on the Debtor's complaint was held.  At the conclusion of the first day of the hearing, Mr. Fellheimer sought to withdraw the complaint on behalf of the Debtor and to terminate the entire adversary proceeding.  In the words of Mr. Fellheimer, the Debtor decided to withdraw the complaint "[b]ecause it doesn't see any benefit . . . in proceeding in the long run."  Mr. Fellheimer further stated:  "I don't want to burden the Court any further with this.  And I also feel that . . . the best interest of the debtor would be served by ending it and working towards a reorganization."  The bankruptcy court then withdrew the complaint and chastised Mr. Fellheimer for, in its view, representing the interests of Mr.

_____

[2]  Bankruptcy Rule 9011 essentially tracks Rule 11 in all pertinent respects, as those rules then existed.

Burke over the interests of the Debtor.[3]  The Committee reserved

its right to proceed with its sanction motion at a later date.

On August 25, 1993, FE&B filed an interim fees and expenses

application for the period January 20, 1993, through August 21,

1993 ("fees application").  FE&B requested $200,275.50 in

compensation and $21,916.83 for the reimbursement of expenses.

The Committee thereafter filed an objection to FE&B's fees

application on September 23, 1993.

## II. THE PROCEEDINGS BELOW

### A. The Bankruptcy Court

The bankruptcy court held a hearing on the fees application

and on the sanction motion on October 20, 1993, and issued its

---

[3]  The bankruptcy court warned:

[Y]ou're on a knife's edge, Mr. Fellheimer.  You're
representing Mr. Burke, he has no independent counsel.
He may be a lawyer himself, but he met with you outside
the Erie Club in order to determine what he should
personally get out of the reorganization for him to
step out as manager.  In that instance you're acting as
his lawyer.  And that's adverse to the interests of the
[Debtor].

. . . .

. . . You have to be very careful about how you
represent Mr. Burke.  Because to the extent that you
represent him to the detriment of the [Debtor] and the
creditors, you're violating your fiduciary duty to the
[Debtor].  And you're representing him individually and
you're risking whatever fee you might get out of this.

. . . And for Mr. Burke to get upset because the
creditors committee thinks that he's incompetent, is
unfortunate.  You as a lawyer, as a practicing lawyer
have to tone him down.  You can't file this kind of
lawsuit that you filed here just because Mr. Burke is
upset.  That's ridiculous.

opinion and order regarding these matters on November 2, 1993. Charter Techs., Inc., d.b.a. Elgin Elecs. v. Knox, McLaughlin, Gornall & Sennett, P.C. (*In re* Charter Techs., Inc.), 160 B.R. 925 (Bankr. W.D. Pa.).  The bankruptcy court granted the sanction motion and denied FE&B's entire fees application, except for $15,000 which the court allowed for reimbursement of expenses. The bankruptcy court also granted the motion of the Committee for the appointment of a Chapter 11 trustee.  In reaching its decision, the bankruptcy court made the following factual findings.

First, the bankruptcy court found that "[t]he evidence establishing that Fustine and the Knox Firm represented the Committee, and only the Committee, is overwhelming."  Charter Techs., 160 B.R. at 927.  In this regard, the bankruptcy court further found that "[t]he Debtor failed to present any evidence that Fustine and the Knox Firm represented any individual member of the Committee."  Id.

Second, the bankruptcy court found that "[t]he overwhelming evidence supports the fact that the language of the June 4th letter accurately reflected the Committee's position."  Id. at 928.  The bankruptcy court found that the Debtor's allegations to the contrary were based upon "a complete lack of evidence."  Id. The Debtor had attempted to prove that the June 4th letter was a vehicle designed to further the interests of individual members of the Committee, rather than a statement of the consensus of the Committee.  Towards this end, the Debtor alleged in its complaint that two Committee members--Robert E. Miller and Frank

Slurkanich--telephoned Mr. Burke and "stated that Fustine and the Knox Firm were not authorized to send the June 4th letter and that it does not represent the position or opinion of the Committee." Id. The bankruptcy court found, however, that Mr. Slurkanich--a former employee of the Debtor--never denied the authority of Mr. Fustine to send the June 4th letter. Instead, Mr. Slurkanich merely indicated that he did not personally "put out" the letter. Furthermore, the bankruptcy court found that "Slurkanich did not call in response to the June 4th letter, but rather in response to a notice of termination as a sales representative which Slurkanich received from Burke on June 7, 1993, which Burke had issued in retaliation for the Committee's June 4th letter!" Id. The bankruptcy court found, moreover, that the Committee had objectively sound reasons for wishing to replace Mr. Burke.[4]

Third, the bankruptcy court summarily rejected the Debtor's defamation allegations. The Debtor had claimed that Mr. Fustine and the Knox firm stated falsely that the Debtor had accumulated $1,600,000 in pre-tax losses since October 1989 and that the Debtor had nonetheless paid $315,000 in stock dividends over that same time period. The bankruptcy court found that it was "readily determin[able]" through the Debtor's own financial

_____

[4] The bankruptcy court cited a draft report prepared by the accounting firm of Ernst & Young for a potential investor which "identified numerous management deficiencies from which it would have been reasonable for the Committee to determine the need to replace Burke." Id.

records that these statements were "true and accurate." Id. at 929.

Fourth, the bankruptcy court found that there was "absolutely no evidence" to support the Debtor's allegation that Mr. Fustine breached an agreement that he had allegedly entered into that forbade him from meeting with potential investors in the Debtor. Id. According to the complaint, Mr. Fustine breached this agreement when he met with Vito Casoni and George Leone of SMG Control Systems. As the bankruptcy court found, this meeting took place on May 20, 1993. The earliest date that Mr. Fellheimer discussed such an agreement with Mr. Fustine, however, according to Mr. Fellheimer's own time sheets, was May 21, 1993--one day after the alleged breach of the agreement took place.

Fifth, the bankruptcy court found that, contrary to the assertion in the Debtor's complaint, the statements of Mr. Fustine to Mr. Casoni of SMG Control Systems did not cause SMG Control Systems to lower its bid for the Debtor. Id. As the bankruptcy court noted, the affidavit of Mr. Casoni submitted by the Debtor explicitly states that "the session of May 20th with Mr. Fustine did not alter SMG's offer as to price." The bankruptcy court also found that Mr. Fustine did not, as further asserted in the complaint, cause Kulicke & Soffa to withdraw its business from the Debtor. Id. As indicated by the affidavit of Jim King of Kulicke & Soffa, that firm "retracted business from the debtor as a result of the debtor's inability to fulfill Kulicke & Soffa's production schedule on time and serious

problems we perceive in the debtor's quality and recycling procedure." The bankruptcy court found that FE&B had not bothered to contact Mr. Casoni, or anyone at Kulicke & Soffa, to ascertain the veracity of these allegations before filing the complaint. Id.

Last, the bankruptcy court was greatly offended by Mr. Fellheimer's misrepresentation to it that Mr. Burke would be out of the country and unable to attend the hearing on the complaint on the day it was originally scheduled. Id. at 929-30. After noting that FE&B had made six telephone calls to the Debtor on July 6, including at least one direct call between Mr. Fellheimer and Mr. Burke, the bankruptcy court concluded: "There is no rational basis favorable to Fellheimer as to why he would represent to the Court on July 6 that he thought Burke was in England and unavailable for the scheduled hearing on July 8." Id. at 930.

On the strength of these preliminary findings, the bankruptcy court determined that sanctions against FE&B were appropriate:

> Debtor's counsel failed to make any reasonable inquiry into the underlying facts before filing the within Complaint. Debtor's counsel knew or should have known that many of the allegations were baseless without any inquiry. . . .
>
> . . . .
>
> . . . The conclusion is inescapable that the purpose of the Complaint was to separate the Committee from its chosen counsel due to the fact that counsel for the Committee was advocating the Committee's position that it would be appropriate to remove Burke from upper-level management.

> . . . .

> In short, Fellheimer filed a lawsuit against the attorneys for the Creditors' Committee seeking $4.25 million in damages for the sole purpose of protecting his real client, Burke, from the legitimate actions of the Creditors' Committee in opposing Burke's management of the Debtor's business. . . .

> We further conclude that Fellheimer never had any intent to proceed with a trial on the merits of this complaint. He knew when he filed the Complaint that the allegations were unsupported. His scheme was to file the Complaint, demand the $4.25 million from the Creditors' Committee counsel, and then delay a hearing on the merits while he used the lawsuit as a wedge to intimidate the Creditor's Committee and its counsel for the benefit of Burke. . . . That illicit purpose plus the total lack of any evidentiary basis for the serious accusations made in the Complaint cry out for judicial recognition and appropriate sanction.

Id. at 930–32.

After discussing the nature and scope of Rule 11 of the Federal Rules of Civil Procedure and Bankruptcy Rule 9011, the bankruptcy court decided to deny FE&B its entire fee in the case. Although FE&B had arguably performed some services of value to the Debtor, the bankruptcy court did not allow it any compensation because "Fellheimer's inappropriate conduct affected and continues to affect this entire case. Both the Debtor and its counsel have exhibited conduct of dishonesty, incompetency and gross mismanagement of the affairs of the Debtor." Id. at 933.

## B. The District Court

FE&B then appealed the imposition of sanctions to the district court. Before the district court, FE&B argued primarily

that the bankruptcy court's decision to impose Rule 11 and Bankruptcy Rule 9011 sanctions was factually unsupported and that FE&B's filing of the complaint was justified.  FE&B also argued that the bankruptcy court had erred by imposing Rule 11 and Bankruptcy Rule 9011 sanctions upon the entire firm of FE&B, instead of merely upon the individual attorney who had signed the complaint, Mr. Eichen.

The district court first found that the record supported the bankruptcy court's findings regarding the factual baselessness of each of the complaint's material allegations.  The district court also found that the record supported the finding that FE&B filed the complaint for an improper purpose and in subjective bad faith.

The district court did, however, agree with FE&B that Rule 11 and Bankruptcy Rule 9011 sanctions, as they then existed,[5] could only be imposed upon the individual attorney who had signed the offending document.  See Pavelic & LeFlore v. Marvel Entertainment Group, 493 U.S. 120 (1989).  The district court nonetheless affirmed the imposition of sanctions on the following alternative grounds:  (1) FE&B waived the right to contest the imposition of sanctions against it as a firm by failing to raise the issue in the bankruptcy court and by failing to include the issue in its Bankruptcy Rule 8006 statement of issues for

_____

[5]  Effective December 1, 1993, after the bankruptcy court had issued its opinion and order in this case, Rule 11 of the Federal Rules of Civil Procedure was amended to explicitly allow the imposition of sanctions against law firms.

appellate review; (2) the imposition of sanctions represented a proper exercise of the bankruptcy court's inherent power to sanction; and (3) the imposition of sanctions represented a proper exercise of the bankruptcy court's authority under 11 U.S.C. § 328(c)[6] to deny professional fees in appropriate cases. Appeal to this court followed.

### III. STANDARD OF REVIEW

Because the district court sat as an appellate court in reviewing this matter, our own review of that court's factual and legal determinations is plenary.  Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir. 1981).  In reviewing the bankruptcy court's determinations, we exercise the same standard of review as the district court.  Brown v. Pennsylvania State Employees Credit Union, 851 F.2d 81, 84 (3d Cir. 1988).

We may not set aside the bankruptcy court's factual findings unless we first conclude that they are clearly erroneous. Bankruptcy Rule 8013; Brown, 851 F.2d at 84 (citation omitted). As we have stated before in other contexts, the clearly erroneous standard is fairly stringent:  "It is the responsibility of an

_____

[6]  Section 328(c) provides:

[T]he court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

appellate court to accept the ultimate factual determination of the fact-finder unless that determination either is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." Hoots v. Pennsylvania, 703 F.2d 722, 725 (3d Cir. 1983) (citation omitted). Furthermore, in reviewing the bankruptcy court's factual findings we are to give "due regard" to the opportunity of that court to judge first-hand the credibility of witnesses. Bankruptcy Rule 8013. Our review of the bankruptcy court's legal determinations is plenary. Brown, 851 F.2d at 84.

In our review of the imposition of sanctions, the primary question before us is whether the sanctioning court abused its discretion. See, e.g., Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990) ("[A]n appellate court should apply an abuse-of-discretion standard in reviewing all aspects of a district court's Rule 11 determination."); Chambers v. Nasco, Inc., 501 U.S. 32, 55 (1991) ("We review a court's imposition of sanctions under its inherent power for abuse of discretion."). We do not seek to determine whether we would have applied the sanction ourselves in the first instance. See Eavenson, Auchmuty & Greenwald v. Holtzman, 775 F.2d 535, 540 (3d Cir. 1985)

## IV. DISCUSSION

As discussed above, the bankruptcy court acted pursuant to Rule 11 of the Federal Rules of Civil Procedure and Bankruptcy Rule 9011 when it sanctioned FE&B by denying FE&B's fees application. All parties are in agreement, however, that

sanctions could not properly be imposed against law firms under the Supreme Court's interpretation of the version of Rule 11 then in effect.  See Pavelic & LeFlore v. Marvel Entertainment Group, 493 U.S. 120 (1989) (holding that Rule 11 sanctions may only be imposed upon the attorney who actually signs the documents in question).  The district court affirmed the bankruptcy court's denial of FE&B's fees application despite that court's misapplication of Rule 11 by finding three alternative grounds for upholding the sanction.  The district court did so after noting the Supreme Court's long-standing holding that "'[i]n the review of judicial proceedings the rule is settled that if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason.'" Brown v. Allen, 344 U.S. 443, 459 (1953) (quoting Helvering v. Gowran, 302 U.S. 238, 245 (1937)) (other citation omitted).  Of the three grounds provided by the district court, we find the characterization of this sanction as an exercise of the bankruptcy court's inherent power to be the most appropriate justification under these circumstances and it is to this ground that we first turn.

## A. Inherent Power to Sanction

In Chambers v. Nasco, Inc., 501 U.S. 32 (1991), the Supreme Court addressed the nature and scope of the federal courts' inherent power to control the conduct of those who appear before them.  The Court began by surveying its long history of case law in this area:  "It has long been understood that '[c]ertain implied powers must necessarily result to our Courts of justice

from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'"  Id. at 43 (quoting United States v. Hudson, 7 Cranch 32, 34 (1812)) (other citation omitted).  Among the implied and "'incidental'" powers of a federal court is the power "to discipline attorneys who appear before it."  Id. (quoting Ex parte Burr, 9 Wheat. 529, 531 (1824)).  Included among the types of sanctionable conduct discussed by Chambers are those cases where

> a party has "'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" . . . The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of "vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy."

Id. at 45-46 (internal citations and quotations omitted).  See also Gillette Foods Inc. v. Bayernwald-Fruchteverwertung, 977 F.2d 809, 813 (3d Cir. 1992) (quoting Chambers).  "Because of their very potency," however, the federal courts must be careful to exercise their inherent powers "with restraint and discretion."  Chambers, 501 U.S. at 44.  "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process."  Id. at 44-45. In this case, the bankruptcy court determined that denying FE&B's entire fees application constituted an appropriate sanction.

We first note here that the advent of Rule 11 and the other statutory sanctions did not eviscerate the courts' inherent power

to sanction: "[W]hereas each of the other mechanisms reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses. At the very least, the inherent power must continue to exist to fill in the interstices." Id. at 46. Moreover, we have previously rejected the proposition "that once a claim is held not to violate Rule 11, the court is prevented from imposing sanctions under its inherent power." Gillette Foods, 977 F.2d at 813.

Against this backdrop, FE&B challenges the bankruptcy court's exercise of its inherent sanction power on two main grounds. First, FE&B argues that this result deprives FE&B of due process because the bankruptcy court indicated that it was exclusively acting pursuant to Rule 11 and Bankruptcy Rule 9011. Second, FE&B argues on the merits that the record is insufficient to support the finding that it acted in bad faith during the course of its representation of the Debtor.

1. Due Process

The key to FE&B's due process claim is the distinction between Rule 11 sanctions and inherent power sanctions--if these sanctions were identical in all respects, particularized notice as to one sanction would arguably suffice to fully inform FE&B as to the pendency of the other sanction. Rule 11 sanctions and inherent power sanctions do, of course, differ markedly in at least one aspect pertinent to this case: Invocation of a federal court's inherent power to sanction requires a finding of bad faith. Chambers, 501 U.S. at 49; Landon v. Hunt, 938 F.2d 450, 454 (3d Cir. 1991). The imposition of Rule 11 sanctions, on the

other hand, requires only a showing of objectively unreasonable conduct.  E.g., Lony v. E.I. Du Pont de Nemours & Co., 935 F.2d 604, 616 (3d Cir. 1991).

We have previously held that "[p]rior to sanctioning an attorney, a court must provide the party to be sanctioned with notice of and some opportunity to respond to the charges" in order to satisfy the requirements of due process.  Jones v. Pittsburgh Nat'l Corp., 899 F.2d 1350, 1357 (3d Cir. 1990) (citations omitted).  Moreover, we have stated that "we think particularized notice is required to comport with due process." Id. (citation omitted).  FE&B has raised a fairly significant argument here as the bankruptcy court never indicated that it was acting under its inherent sanction power in this case.  Indeed, neither the motion for sanctions nor the bankruptcy court ever mentioned any ground for sanctions other than Rule 11 and Bankruptcy Rule 9011.  As discussed above, it was the district court that first justified the bankruptcy court's conduct on the ground of the inherent power to sanction.  Nonetheless, we agree with the district court's reasoning and we likewise find that justifying the bankruptcy court's conduct on that ground does not violate FE&B's right to due process on the record of this case.

We do not intend to disturb the line of case law cited to by FE&B in its brief.  See Simmerman v. Corino, 27 F.3d 58, 64 (3d Cir. 1994); Landon, 938 F.2d at 454; Jones, 899 F.2d at 1357-58; Gagliardi v. McWilliams, 834 F.2d 81, 83 (3d Cir. 1987); Eavenson, Auchmuty & Greenwald, 775 F.2d at 540-41; Eash v. Riggins Trucking Inc., 757 F.2d 557, 570-71 (3d Cir. 1985).

Rather, our holding is a narrow one, compelled by our finding that FE&B was provided with sufficient, advance notice of exactly which conduct was alleged to be sanctionable and, furthermore, that FE&B was aware that it stood accused of having acted in bad faith.

(a) Particularized Notice

In Jones we stated that the reason behind the particularized notice requirement was to put "a party . . . on notice as to the particular factors that he must address if he is to avoid sanctions." Jones, 899 F.2d at 1357. Generally speaking, particularized notice will usually require notice of the precise sanctioning tool that the court intends to employ. In Jones, as was the case here, the sanctioned attorney was initially informed that only Rule 11 sanctions were being considered. Id. Only when the sanctioned attorney received the district court's order was he informed that sanctions were also being imposed pursuant to 28 U.S.C. § 1927,[7] which has been interpreted to require a finding of bad faith conduct. Id. On appeal, we vacated the imposition of sanctions under § 1927 because the sanctioned

---

[7] § 1927.  Counsel's liability for excessive costs

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

attorney had not been provided with sufficient notice that his subjective bad faith was in question.[8]

The situation confronting the sanctioned attorney in Jones is to be contrasted with the situation facing FE&B:  First, the sanction motion filed by Mr. Fustine, the Knox firm, and the Committee explicitly charges FE&B with bad faith in the filing of the complaint on behalf of the debtor.  Specifically, the

_____

[8]  The motion for sanctions filed by the sanctioned attorney's opponents pursuant to Rule 11 was hinged primarily upon procedural noncompliance:  "[The motion] alleged that plaintiff had failed to file a pre-trial statement, to submit a RICO case statement, to answer interrogatories, to produce documents requested and to conduct any discovery and that plaintiff had had no factual basis for the RICO count."  Id. at 1353.  This request for sanctions was reiterated on at least two occasions, but again these requests were insufficient to put the attorney on notice of the fact that he stood accused of having acted in subjective bad faith:  The first reiteration "recited that it sought dismissal and fees based upon plaintiff's 'conduct of [the] litigation in general,' including the failure to answer interrogatories, failure to file a RICO case statement or pre-trial statement and failure to produce requested documents."  Id. at 1354.

The sanctioned attorney's answer to his opponent's motion for counsel fees--which constituted his sole opportunity to respond to the question of sanctions--was insufficient to demonstrate that he was on notice that he stood accused of more than objectively unreasonable conduct.  His response merely repeated the requirements of Rule 11:

In response to the charge of having violated Rule 11, appellant asserted that he "believed throughout a large portion of the instant litigation . . . that the Complaint was warranted by existing law; that, alternatively, it was warranted by good faith arguments for extension, modification or reversal of existing laws; and that it was not interposed for delay or needless increase in cost of litigation."

Id.

sanction motion charges that FE&B was actually aware of, or had at least remained deliberately indifferent to, the factual and legal baselessness of the complaint.

Second, and much more importantly, the bankruptcy court also made it clear that it suspected FE&B of having acted in bad faith both in its representation of the debtor's interests and in the filing of the complaint.  At the conclusion of the August 3, 1993 hearing on the Debtor's complaint, after Mr. Fellheimer had sought to withdraw the complaint, the bankruptcy court first stated that it believed that FE&B was representing the interests of Mr. Burke over the interests of the Debtor:  "[Y]ou're on a knife's edge, Mr. Fellheimer.  You're representing Mr. Burke . . . . And that's adverse to the interests of the [Debtor]. . . . [T]o the extent that you represent [Mr. Burke] to the detriment of the [Debtor] and the creditors, you're violating your fiduciary duty to the [Debtor]."  The bankruptcy court then stated its belief that FE&B had filed the complaint in bad faith: "[F]or Mr. Burke to get upset because the creditors committee thinks that he's incompetent, is unfortunate.  You . . . have to tone him down.  You can't file this kind of lawsuit that you filed here just because Mr. Burke is upset.  That's ridiculous. . . . [T]his whole litigation is a lot of nonsense."  The bankruptcy court even indicated the nature of the sanction that it was considering:  "[Y]ou're representing [Mr. Burke] individually and you're risking whatever fee you might get out of this."

If the bankruptcy court had then and there conducted a hearing on the sanction motion, FE&B would arguably possess a stronger due process argument--this is the key factor which distinguishes this case from Jones. In Jones, the record was insufficient to demonstrate that the sanctioned attorney had advance notice that the sanctioning court was contemplating the imposition of sanctions which hinged upon a finding of bad faith. In this case, FE&B had over eleven weeks once it had learned of the bankruptcy court's leanings on this matter--until October 20, 1993--to prepare for the hearing on the sanctions motion. In the words of our Jones opinion, we can say "with reasonable assurance on this record" that FE&B was "on notice as to the particular factors that [it had to] address if [it was] to avoid sanctions." Jones, 899 F.2d at 1357. Furthermore, it appears evident from Mr. Fellheimer's soliloquy at the October 20, 1993 hearing that he was fully aware of what he and FE&B were up against:

> I have been searching in vain for a way to stop it or to get away from it. I want to tell the Court. I don't want this Court to think that I'm standing here, that I believe what happened was right. I believe it was wrong. If I had it to do over again, I would do it differently. And I can promise you, whatever you decide to do, it won't happen again. I would approach it differently and I would make sure my firm approaches it differently. I'm very unhappy with the way it came out. I will tell you that there were a lot better ways to resolve that problem than the one we selected. And I want to acknowledge that to you and admit that to Your Honor and admit to Your Honor that the result was bad. For that I apologize.
>
> . . . .
>
> . . . I would like to step aside. Whatever I'm to pay, I'll pay. Whatever fee I'm paid, I'll take, and step aside in the interest of all. I don't think it's

good for this to just go on and on.  It doesn't
accomplish anything for this debtor. . . .

        . . . .

        And I want to publicly say to Guy Fustine in the
courtroom, I think we were wrong in filing the
Complaint.  And maybe I'm handing it to Mr. Lanzillo.
And I will, if that's what it is.  I apologize to you
publicly.  I think we got carried away with the problem
and we went too far, and for that I apologize.  And
whatever the Court decides to do, I will accept.

Therefore, we hold that the record adequately demonstrates
that FE&B was sufficiently on notice that it faced allegations of
having acted in subjective bad faith.

(b) Opportunity to be Heard

The requirements of due process also require a meaningful
opportunity to be heard.  See, e.g., Simmerman, 27 F.3d at 64.
This requirement is especially important in cases such as this
where a law firm's reputation is at stake:

        Sanctions are not to be assessed without full and
        fair consideration by the court.  They often entail a
        fine which may have more than a token effect upon an
        attorney's resources.  More importantly, they act as a
        symbolic statement about the quality and integrity of
        an attorney's work--a statement which may have tangible
        effect upon the attorney's career.

Id.  As discussed above, once the bankruptcy court had made its
position regarding FE&B's conduct clear, FE&B had over eleven
weeks before the hearing to further brief the issue.  FE&B was
then afforded ample opportunity to be heard at the hearing
itself--the transcript of the October 20, 1993 hearing stretches
on for 321 pages.  Based on this record, we cannot find that FE&B
was denied a meaningful opportunity to be heard.

(c) Conclusion

Ideally, there would have been some explicit indication here that the bankruptcy court was acting pursuant to its inherent sanction power. We refuse, however, to go along with FE&B's argument and overturn the bankruptcy court's decision merely because that court applied the wrong label to the righteous use of its inherent sanction power. See Brown v. Allen, 344 U.S. 443, 459 (1953) (citations omitted). We do not expect, however, that the result reached here will be often justified in future cases where the sanctioned party was not explicitly informed beforehand of the precise ground for the imposition of sanctions. To summarize, our finding here was primarily driven by (1) the bankruptcy court's clear warning to FE&B eleven weeks prior to the hearing on the sanctions; and (2) the evidence pertaining to FE&B's actual awareness of the nature of the charges pending against it, such as Mr. Fellheimer's statements at the October 20, 1993 hearing.

2. Sanctions Under the Court's Inherent Power

FE&B also argues on the merits that the record is insufficient to support a finding of bad faith. As discussed above, a finding of bad faith is required to support a court's employment of its inherent sanction power. Chambers, 501 U.S. at 49 (citations omitted).

We first note that, contrary to FE&B's assertions, the bankruptcy court did find that FE&B had acted in bad faith in the course of its representation of the debtor:

The conclusion is inescapable that the purpose of the Complaint was to separate the Committee from its chosen counsel due to the fact that counsel for the Committee was advocating the Committee's position that it would be appropriate to remove Burke from upper-level management.

. . . Fellheimer . . . abandoned his fiduciary obligations as counsel to the Debtor corporation and . . . undert[ook] representation of Burke, individually. As Burke's attorney in such circumstances, he was hostile to the Debtor corporation and its creditors.

. . . .

In short, Fellheimer filed a lawsuit against the attorneys for the Creditors' Committee seeking $4.25 million in damages for the sole purpose of protecting his real client, Burke, from the legitimate actions of the Creditors' Committee in opposing Burke's management of the Debtor's business. . . . Viewed in this light, the actions of Fellheimer as an officer of the Court in violating his fiduciary duties and in bringing such an action are absolutely not to be condoned. We view it as a disgrace to the legal community which we otherwise hold in high regard.

We further conclude that Fellheimer never had any intent to proceed with a trial on the merits of this complaint. He knew when he filed the Complaint that the allegations were unsupported. His scheme was to file the Complaint, demand the $4.25 million from the Creditors' Committee counsel, and then delay a hearing on the merits while he used the lawsuit as a wedge to intimidate the Creditors' Committee and its counsel in his negotiations with it for the benefit of Burke.

Charter Techs., 160 B.R. at 931. We may not disturb these findings, nor may we disturb the bankruptcy court's preliminary findings which led up to them, unless we first find that they are clearly erroneous. Brown, 851 F.2d at 84. Since FE&B offers nothing but tepid contradictions in rebuttal, we must affirm the bankruptcy court's findings, which are sufficient to support its

conclusion that FE&B did act with bad faith in the proceedings below.

Second, we take note of the Supreme Court's cautionary language in Chambers:

> [W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.

Chambers, 501 U.S. at 50. In this case, only Mr. Eichen of FE&B could be properly sanctioned under the versions of Rule 11 and Bankruptcy Rule 9011 then in effect as only Mr. Eichen actually signed the complaint. It is evident, however, that the bankruptcy court imposed firm-wide sanctions because it felt that other attorneys at FE&B, particularly Mr. Fellheimer, were primarily responsible for the sanctionable conduct.[9] Indeed, Mr. Fellheimer himself testified as to his primary role in the filing of the complaint at the October 20, 1993 hearing: "Your Honor told me what he thought of [the complaint] at the time when we withdrew it. And I bear full responsibility for it, Your Honor." We cannot conclude, after reviewing this record, that the bankruptcy court abused its discretion by employing its inherent power to sanction the entire firm of FE&B.

### B. Denial of Fees Under 11 U.S.C. § 328(c)

---

[9] We have previously recognized that a court may employ its inherent sanction power to reach attorneys who did not personally sign the document in question. See Gillette Foods, 977 F.2d at 813.

We also find that the denial of FE&B's fees application may be upheld as a proper exercise of the bankruptcy court's authority under 11 U.S.C. § 328(c). Section 328(c) authorizes the bankruptcy court, in its discretion, to deny a professional person's request for fees if that person "represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed." While it is true that the bankruptcy court did not indicate that it was acting pursuant to § 328(c), the bankruptcy court did explicitly find that FE&B had represented the interests of Mr. Burke, which were adverse to the Debtor's interests: "Fellheimer . . . abandoned his fiduciary obligations as counsel to the Debtor corporation and . . . undert[ook] representation of Burke, individually. As Burke's attorney in such circumstances, he was hostile to the Debtor corporation and its creditors." Charter Techs., 160 B.R. at 931. Having already concluded that the bankruptcy court's underlying factual findings in this regard are not clearly erroneous, we find that the denial of FE&B's fees application may be upheld as an exercise of the bankruptcy court's authority under § 328(c).

In light of our finding that the denial of FE&B's fees application may be upheld as a proper exercise of the bankruptcy court's inherent sanction power, and that the sanctions may alternatively be upheld under 11 U.S.C. § 328(c), we need not address the third ground provided by the district court for upholding the sanctions--namely, that FE&B waived its right to contest the imposition of sanctions. In this regard, we note

only that we would require a fairly persuasive showing that FE&B had waived the right to contest a matter as important as Rule 11 sanctions, given the effect that such sanctions may have upon a law firm's primary stock in trade--its reputation.

## C. Amount of the Sanction

As discussed above, the bankruptcy court sanctioned FE&B by denying FE&B's entire fees application, except for $15,000 for reimbursement of expenses. In its initial brief before this court, FE&B claims that the total amount of compensation due to it amounts to approximately $260,000. This figure represents $167,246.50 allegedly accrued from January 20, 1993, through August 21, 1993,[10] plus $92,169 which allegedly accrued from August 22, 1993, through December 15, 1993. As the district court noted, however, there is nothing in the record to indicate that FE&B ever submitted a fees application to the bankruptcy court for this latter time period. Therefore, FE&B's claim for fees for this latter time period is not properly before this court. Thus, our review of the bankruptcy court's denial of FE&B's fees application reaches only the amount attributable to the period before August 22, 1993: $167,246.50. Needless to say, absent the sanction, FE&B would not necessarily have received even this reduced amount: The Committee, for example,

---

[10] FE&B had attempted to appease the bankruptcy court by "sanctioning itself" for the filing of the complaint. FE&B had accordingly subtracted $33,029--the amount attributable to the filing of the complaint--from its original request of $200,275.50 for this time period.

had hotly contested FE&B's hourly rates as they exceeded those normally charged in that area.

FE&B contests the bankruptcy court's decision to deny its entire fees application on the ground that it did perform at least some services of value to the Debtor. Assuming arguendo that FE&B has performed services of value to the Debtor, we nonetheless uphold the sanctions in their entirety.

The bankruptcy court justified its decision to deny FE&B's entire fees application as follows: "[A]ny fees to be collected by [Fellheimer] shall be collected from his real client, Burke. . . . Fellheimer's inappropriate conduct affected and continues to affect this entire case. Both the Debtor and its counsel have exhibited conduct of dishonesty, incompetency and gross mismanagement of the affairs of the Debtor." Charter Techs., 160 B.R. at 932-33. Based on the extensive record of wrongdoing documented by the bankruptcy court, which we have already upheld, we cannot find this result to be clearly erroneous. Accordingly, we must affirm the denial of FE&B's entire fees application.

## V. CONCLUSION

For all of the foregoing reasons, the decision of the district court upholding the decision of the bankruptcy court is affirmed.

Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc., d/b/a Elgin Electronics; Knox, McLaughlin, Gornall & Sennett, P.C.; and Guy C. Fustine, Esquire, No. 94-3461.

BECKER, Circuit Judge, concurring and dissenting.

The majority opinion is quite powerful and thorough, and almost entirely convincing. It would have my full joinder were the sanction it approves not so very large -- on this record it could apparently amount to more than $167,000. I cannot conceive that we would approve a sanction which required FE&B to actually pay anywhere near that amount under the facts of this case. While I acknowledge that we deal here with deprivation of a fee rather than an ordinary out-of-pocket payment, that difference is not, to me, of great legal significance. Accordingly, while I agree with the majority that the bankruptcy court was warranted in assessing a sanction against FE&B, and concur in the majority's opinion to that extent, I believe the court abused its discretion if in fact the sanction imposed was as high as $167,000 (the fees requested by FE&B), given the nature of the conduct involved.

I do not attempt to put a much different cast than does the majority on FE&B's offending conduct (though I think the question whether it was conflicted between its apparent representation of Mr. Burke and the debtor to be far closer than does the majority).[11] My position is instead impelled by the fact that I

_____

[11]In my view, FE&B could have reasonably concluded that successful reorganization of the debtor hinged on the retention of Mr. Burke. Nevertheless, I cannot say that the bankruptcy court's finding of a conflict was clearly erroneous.

find the opinions of the bankruptcy court, the district court, and the majority to be either silent or unconvincing on one of the most critical aspects of the decision to deny FE&B its fees -- the contribution vel non of FE&B to the reorganization. The record is not sufficiently developed as to this point and I suspect that the efforts of FE&B had far more to do with the ultimately successful reorganization, albeit sans Mr. Burke, than their adversaries admit or the other reviewing judges in this case apparently believe. Moreover, the bankruptcy court's apparent finding that FE&B demonstrated "incompetency and gross mismanagement of the affairs of the debtor," is, in my view, unsupported on the record and clearly erroneous. Indeed, the majority's affirmance of that finding is wholly conclusory. I agree that the filing of the lawsuit against the Knox firm was outrageous.[12] I also agree that the bankruptcy court's finding of a conflict by FE&B and Mr. Fellheimer's temporizing about the availability of Mr. Burke justify a large sanction. But, in view of the totality of circumstances, I cannot agree that the bankruptcy court could be justified in imposing a sanction anywhere near as high as $167,000, even given our deferential review. Accordingly, I would vacate the challenged order, remand the case to the bankruptcy court for a finding as to the value of FE&B's fee absent sanction, and then permit the court to take

---

[12]I say this even though it is not as clear to me as it is to the majority that FE&B lacked a colorable basis, at least at one point, to allege a conflict in the Knox firm's representation.

another look at the matter and appropriately reduce that award, pursuant to its inherent authority,[13] as a sanction for FE&B's conduct.  To this extent, I respectfully dissent.

---

[13]The majority also rests its decision on the bankruptcy court's power to deny fees under 11 U.S.C.A. § 328(c) (1993), which provides that "the court may deny allowance of compensation for services . . . if, at any time . . . such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed."  While this section might have justified a complete denial of FE&B's fees in this case, I cannot join in affirming this sanction as a proper exercise of the bankruptcy court's discretion under § 328(c), since, as the majority recognizes the bankruptcy court did not rely on § 328(c) in imposing this sanction on FE&B.