NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2535
_____

In re:  Dr. R. C. Samanta Roy Institute of Science Technology Inc. ET AL.,
Appellants


_____

On Appeal from the United States District Court
For the District of Delaware
(D.C. Civil Action No. 1-09-cv-00789)
District Judge:  Honorable Gregory M. Sleet
_____

Submitted Under Third Circuit LAR 34.1(a)
March 8, 2011
_____

Before:  SCIRICA, AMBRO, and VANASKIE, Circuit Judges

(Opinion filed June 15, 2011)
_____

OPINION
_____

AMBRO, Circuit Judge

Debtors-Appellants Dr. R.C. Samanta Roy Institute of Science & Technology, Inc.

(SIST), U.S. Acquisitions and Oil (USA&O), MidWest Oil of Wisconsin, MidWest Oil

of Minnesota ("MWOM"), MidWest Oil of Shawano, MidWest Properties of Shawano,

and MidWest Hotels and Motels of Shawano[1] appeal the order of the District Court affirming the September 22, 2009, dismissal of their jointly administered bankruptcy cases. We affirm.

**I.**

SIST is the parent corporation of USA&O, MidWest Oil of Wisconsin, MidWest Oil of Shawano, MidWest Oil of Minnesota, MidWest Properties of Shawano, and MidWest Hotels and Motels of Shawano. On March 16, 2009, SIST and its subsidiary companies (collectively, the "Debtors") filed voluntary petitions under Chapter 11 of the Bankruptcy Code. They are operating entities and holding companies owning real property leased to Debtor-owned subsidiaries as well as non-Debtor entities. Through affiliates, they own, among other things, hotels, gas stations, and an amusement park/racetrack. Debtors use income from their business enterprises to fund not-for-profit educational activities.

On June 9, 2009, Debtors filed a motion, which the Bankruptcy Court granted, to extend the initial 120-day period of exclusivity, *see* 11 U.S.C. § 1121(b), for an additional 120 days until October 12, 2009. In August 2009, Debtors for the first time applied to the Court to employ a financial advisor.

Vermillion State Bank, a secured creditor of MWOM, sought relief from the automatic stay in order to conduct a sheriff's sale of a vacant, non-operating gas station

---

[1] Debtor SIST voluntarily withdrew from this appeal and was dismissed on March 1, 2011. Debtor USA&O voluntarily withdrew and was dismissed on January 19, 2011. Debtors MidWest Oil of Minnesota and MidWest Properties of Shawano voluntarily also withdrew and were dismissed on August 3, 2010.

(the "Oakdale Property") for which MWOM owed $42,000 in real estate taxes and had made no post-petition mortgage or real estate tax payments. The Bankruptcy Court held a lift-stay hearing on September 14-15, 2009. Vermillion alleged that it had foreclosed on the Oakdale Property but the sheriff's sale was stayed by the bankruptcy filings. At the lift-stay hearing, a manager of MWOM testified that it had not made a counter-offer to, and had "basically ignored," a December 2008 offer on the Oakdale Property because the offer was for approximately $2 million and MWOM's Board of Directors had decided it wanted $7 million. Subsequently, SIST CEO Naomi Isaacson testified that she had communicated with the potential purchaser prior to the filings but had ceased communication post-petition because she was trying to maximize the price and did not want the buyer to know about the bankruptcy. A subsequent appraisal of the property showed a value of about $2 million. Debtors finally counter-offered $2.7 million in September 2009 at the urging of the Bankruptcy Court.

On September 16, 2009, following the Vermillion lift-stay hearing, the Bankruptcy Court *sua sponte* issued a Rule to Show Cause Order "at which the Debtors must show cause why the Court should not dismiss the cases or appoint a Chapter 11 Trustee." Following the hearing on the order, the Bankruptcy Court, on September 22, 2009, dismissed the cases. In doing so, it made the following findings:

1. Debtors had not filed tax returns since 2004, including the return for 2008 that was due after the petition date;
2. Debtors' Monthly Operating Reports revealed continuing losses, and, despite the losses, Debtors had no "business plan and therefore were unable at the hearing to meet their burden of proving a reasonable likelihood of rehabilitation;"

3

3. "Debtors belatedly responded to the interested purchaser but only in the face of the Show Cause Order. The [C]ourt is left to its concern about other lost or delayed opportunities and, moreover, to Debtors' inattention to action it could or should have be taking to market its assets;"
4. Debtors failed to obtain financing six months into the Chapter 11 cases, and belatedly hired a financial advisor only "after six months of inaction during which time their business continued to falter and only when Debtors' first extension of exclusivity is about to expire;"
5. Debtors' did not advise the Court or the United States Trustee where or the manner in which they were holding $60,000 in cash from other business operations, and that "such 'cash management' constitutes not only gross mismanagement but, as well, a lack of candor."

On appeal, the District Court affirmed the Bankruptcy Court, holding that the dismissal was not an abuse of discretion where the Bankruptcy Court had made the findings listed above. Debtors timely appeal to us the District Court's order.[2]

## II.

The decision to dismiss a Chapter 11 petition "is committed to the sound discretion of the bankruptcy or district court[,] and [we] . . . review for abuse of discretion." *In re SGL Carbon Corp.*, 200 F.3d 154, 159 (3d Cir. 1999). Because the District Court sat as an appellate court to review the Bankruptcy Court, our review of that [C]ourt's factual and legal determinations is plenary." *Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc.*, 57 F.3d 1215, 1223 (3d Cir. 1995). "[W]e review the Bankruptcy Court's legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for abuse thereof." *In re Goody's Family Clothing*, 610 F.3d 812, 816 (3d Cir. 2010) (citation omitted). A bankruptcy court has broad discretion to

---

[2] The District Court had jurisdiction under 28 U.S.C. § 158(a). We have jurisdiction under 28 U.S.C. § 1291.

4

consider relevant factors in deciding a motion to dismiss a Chapter 11 petition. *SGL Carbon*, 200 F.3d at 160. A bankruptcy court's "ultimate determination of fact" will not be set aside unless "that determination is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." *Fellheimer*, 57 F.3d at 1223 (quoting *Hoots v. Pennsylvania*, 703 F.2d 722, 725 (3d Cir. 1983)); *see also* Fed. R. Bankr. P. 8013 ("[F]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given the opportunity of the bankruptcy court to judge the credibility of the witnesses.").

Absent unusual circumstance, 11 U.S.C. § 1112 provides that, once cause is established, a bankruptcy court *shall* convert a case to Chapter 7 or dismiss the case "unless the court determines that the appointment of a trustee or examiner is in the best interests of the creditors and the estate." 11 U.S.C. § 1112(b)(1). Thus, once cause is found, the burden shifts to the opposing party to show why dismissal or conversion would not be in the best interests of the estate and the creditors.[3] 11 U.S.C. §1112(b)(2). Here, the Bankruptcy Court found various factors supporting cause to dismiss that mirror factors in the non-exclusive list in § 1112(b)(4), including: failure to file post-petition tax returns, (b)(4)(I); continuing losses, (b)(4)(A); absence of a likelihood of rehabilitation,

---

[3] The Court noted that the parties agreed at the show-cause hearing that the appointment of a trustee would be not appropriate for these cases because Debtors have no employees and because of the expense and delay that would be involved in a trustee's learning about all the different businesses. Separately, Debtors' counsel and the Court also agreed that conversion to Chapter 7 would be inappropriate because Debtors are charitable organizations under 11 U.S.C. 1112(c).

5

(b)(4)(A); gross mismanagement of the estate, (b)(4)(E); and lack of candor to the Court and the trustee, (b)(4)(H). The Court also found factors not explicitly listed in § 1112(b)(4) that bear on the debtors' mismanagement of the estate and ability to consummate a plan, including: failure to respond to a purchaser interested in the Oakdale Property for close to its appraised value; failure to hire a financial advisor in a timely fashion or to develop a business plan, which made Debtors unable to obtain necessary financing; and failure to maximize the value of the assets for the benefit of the creditors.

Debtors advance five theories for finding an abuse of discretion, none of which is persuasive.

## 1) Statutory Bar To Dismissal

Debtors argue dismissal was barred during the exclusivity period because a debtor should be allowed time to submit a plan, even if the plan ultimately proposed proves unworkable. They cite *In re Toyota of Yonkers, Inc.*, 135 B.R. 471, 476-77 (Bankr. S.D.N.Y. 1992). Here, there was no infusion of new capital or new management, as existed in *Toyota of Yonkers*. Also unlike *Toyota of Yonkers*, management had not developed a business plan that could form the basis of a plan of reorganization.[4]

There is nothing in the plain language of § 1112(b) creating a statutory bar to considering a motion to dismiss during the exclusivity period. *See* § 1112(b) (stating

---

[4] Debtors note that they hired a financial consultant in August 2009 to assist them in developing a business plan. The Court, however, found that Debtors had delayed from April 2009, when they first began discussions with the advisor, until August, when the first extension of the period of exclusivity was nearing expiration and a request for further extension was pending. The Court saw this delay as further evidence of Debtors' mismanagement of the estate.

parameters for motions to dismiss). Nor have we held that a court may not consider a motion to dismiss during the initial period of exclusivity, let alone during an extended period as exists here. In *SGL Carbon*, we held that the debtor's Chapter 11 petition was subject to dismissal even though the committee of unsecured creditors moved for dismissal approximately one month into the 120-day period of exclusivity. 200 F. 3d at 157-58, 169; *see also In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991) (reviewing motion to dismiss filed "just a few weeks after the petition was filed" and evaluating for bad faith only, with no analysis of the exclusivity period being a *per se* barrier).

We thus see no bar to considering a motion to dismiss in a Chapter 11 case within the period of exclusivity, particularly where, as here, the period has been extended at least once, there is no business or confirmation plan, and there are sufficient factors supporting the court's finding of cause.

### 2) Tax Returns

Debtors argue that the Bankruptcy Court erroneously considered their failure to file pre-petition tax returns since 2004. They assert that the Court's reliance on the failure to pay taxes was misplaced because, as a § 501(c)(3) corporation, SIST has no income tax liability. They further contend that the deadline for filing 2008 taxes had not yet passed by the March 2009 filing date, they had in any event an extension for filing 2008 taxes, and pre-petition tax or filing obligations are irrelevant under § 1112(b)(4)(I).

That subsection provides that failure to file a tax return or pay taxes post-petition can be a ground for dismissal. Pre-petition tax-filing conduct was not irrelevant to the Court's inquiry. The Court found also that Debtors had failed to file any tax returns post-

7

petition. Indeed, Debtors had not filed any returns "since 2004, including the return for 2008 which was due after the Petition Date." Debtors' rebuttal is obvious: SIST, as a non-profit, does not owe taxes and filed an extension for the 2008 return. However, Debtors failed to produce any evidence of the extension or even to mention it to the Bankruptcy Court. Further, they had a legal obligation to file returns even if no taxes were due between 2004 and 2008. They produced no justification for their failure to do so nor evidence that this omission would be cured in a reasonable time. Because the Court found cause to dismiss, Debtors had the burden of demonstrating that there was "a reasonable justification for [their] . . . omission . . . that [would] be cured in a reasonable period of time." 11 U.S.C. § 1112(b)(2)(B)(i) & (ii). They did not meet this burden.

### 3) Notice of the subject matter of the hearing

Debtors argue that the Court failed to give sufficient notice of the subject matter of the show-cause hearing, resulting in their inability to prepare adequately. Subsection 1112(b)(1) permits a bankruptcy court to dismiss a case for cause "after notice and a hearing." 11 U.S.C. § 102(1)(A) defines this as "such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances."

The Bankruptcy Court gave six days notice to the parties and clearly detailed in the Order for Rule to Show Cause its specific concerns: "no progress towards confirmation;" the failure to consider a "substantial offer for the sale of a property in default" and on which Debtors had made no post-petition payments; monthly reports showing that Debtors were "operating at a continuing loss;" "gross mismanagement;" and

8

unlikely "prospects for rehabilitation." Debtors thus had ample notice that monthly operating losses, lack of a business plan, Debtors' failure to respond in a timely fashion to an interested purchaser for the Oakdale Property, and inability to obtain financing would be important topics at the hearing. Failure to file tax returns was not mentioned in the show-cause order; however, the Court's order noted its concern with mismanagement. If Debtors wanted to introduce evidence to allay the Court's concerns about their failure to file tax returns since 2004, they had ample opportunity to speak up at the hearing.

Debtors also contend the Court erred by relying on the U.S. Trustee's oral motion to dismiss made at the show-cause hearing without notice to Debtors. There is no evidence the Court decided to dismiss based on the U.S. Trustee's motion. Further, the Debtors had adequate notice that they needed to defend a motion to dismiss because the Court itself had ordered a show-cause hearing. Debtors' concern over other topics discussed at the hearing is misplaced, as the Court did not rely on these in dismissing the cases. *See supra* at 3-4. The Bankruptcy Court thus provided Debtors sufficient notice of the areas they needed to address at the show-cause hearing.

**4) Considering evidence outside the record**

Debtors argue that the Court erred by dismissing the cases based on assertions that were not of record in their cases. First, they contend that the Court erred in finding that the estates were diminishing in value by purportedly relying on a document showing income for the racetrack/amusement park that operated on property owned by USA&O, where the document had not been admitted as part of the record. However, the Court made no mention of this disputed document. In addition, other record evidence – such as

9

the July monthly operating reports showing a loss, the failure to make payments to secured lenders, the failure to pay any post-petition mortgage or real estate tax payments on the Oakdale Property, and the failure of Isaacson to testify that the Debtors' monthly reports were showing a profit – amply supports the Court's finding that the estates were diminishing in value.

Second, Debtors contend that the Court erroneously relied on factual assertions in two relief-from-stay motions that had not been decided. One assertion involved the cash management system of MidWest Amusement Park ("MAP"), a non-debtor subsidiary that operated the racetrack/amusement park property. Debtors argue that a key issue in the relief-from-stay motion was whether the cash generated by the amusement park was owned by its operating entity MAP or Debtor USA&O, MAP's landlord. The other assertions involved testimony in the Vermillion proceeding that Debtors had not responded to a purchaser interested in the Oakdale Property, as well as testimony by Vermillion's representative that the monthly reports showed continuing losses (a conclusion Debtors dispute).

SIST's CEO testified at the show-cause hearing that Debtors were reporting to the creditors weekly gross sales totals and bank statements for the money collected at the amusement park. She explained in detail the park's accounting methods and that the balance of the money was being kept in cash in a safe at a gas station with no security rather than being reported to the Trustee, invested, or kept in a more secure place. The Court did not err in considering the issue and evaluating whether Debtors had properly

10

accounted for estate funds, as the issue was sufficiently related to the general administration of the estate.

Debtors claim also that the Court erred in considering testimony from the Vermillion proceeding and dismissing their cases based on the Court's finding that the Debtors were dilatory in trying to sell the Oakdale Property, when in their view they had delayed to avoid telling the buyer they were in bankruptcy in order to maximize the sale price. Debtors only responded to a potential purchaser for the Oakdale Property at the urging of the Court in September 2009 and counter-offered with a price close to that made to them the preceding December. The Court's finding that Debtors unreasonably delayed in responding to a reasonable purchase offer was supported by record evidence, including testimony from Isaacson, and was obviously not clearly erroneous.

During the show-cause hearing, the U.S. Trustee represented that Debtors' monthly reports overall showed losses. In addition, the Court had before it the reports for July 2009, which showed a loss. The Court's finding therefore is supported by record evidence. Debtors also allege that viewing all the reports as a whole shows no loss, but that the Court did not have the other monthly reports before it. The show-cause hearing was Debtors' opportunity to present other evidence of profits and losses, and they failed to take advantage of that opportunity. The Court clearly apprised them in the show-cause order of its concerns that "the Monthly Operating Reports indicate that the Debtors are operating at a continuing loss." If Debtors had other relevant evidence, their obligation was to introduce it. They did not, and the Bankruptcy Court did not err when it interpreted the evidence before it to reach its conclusion.

11

**5) Good faith effort to make progress**

Finally, Debtors find error in the Bankruptcy Court's conclusion that Debtors' failed to make progress in their cases where they argue they were involved in a "constant flow of litigation" and were administering "their estates in good faith and [making] progress towards the formulation of a plan of reorganization." Appellants' Br. at 40. The Court found that the Debtors had hired a financial advisor "only after six months of inaction during which time their businesses continued to falter." It further found there was no business plan yet developed ─ let alone a plan of reorganization ─ six months into the bankruptcy, and that the Debtors had thus been unable to obtain financing. This finding is supported by evidence in the record and by the Debtors' own admissions. It is therefore not clearly erroneous.

\* \* \* \* \*

In this context, we affirm the dismissal of Debtors' bankruptcy cases.