**In re Edward W. HARKER, Esquire, Receiver & Custodian of the Assets of J. Nevin White, Alleged Debtor.**

**In re John Nevin White, Alleged Debtor.**

**Bankruptcy Nos. 5–96–00241, 5–96–01417.**

United States Bankruptcy Court, M.D. Pennsylvania, Wilkes–Barre Division.

Oct. 27, 1999.

---

Edward W. Harker, Carlisle, PA, pro se.

Gregory Lyons, Harrisburg, PA, Office of the U.S. Trustee.

John C. Dowling, Rhoads & Sinon, Harrisburg, PA, for John Nevin White.

Keith O. Brenneman, Snelbaker, Brenneman & Spare, Mechanicsburg, PA, for Willa White.

Benjamin V.R. Conlon, Lake Norman, NC, pro se litigant.

### OPINION

JOHN J. THOMAS, Bankruptcy Judge.

Benjamin V.R. Conlon is the subject of various sanction motions filed by Edward W. Harker, Esq., the United States Trustee, and Willa White.

While the sanction requests of the various parties were immediately generated by the Involuntary Petition filed by Benjamin Conlon against Attorney Harker, an analysis of those requests require an appreciation of the bizarre procedural and factual background that preceded the case.

J. Nevin White and Willa White were parties to a rather acrimonious domestic litigation in the Court of Common Pleas of Cumberland County, Pennsylvania, filed to No. 4730 Civil 1981. During that dispute, the State Court issued an order dividing the significant assets of the parties, which assets included the J. Nevin White Lumber Co., a substantial operation involving many acres of valuable land holdings. That order was subsequently appealed to the Pennsylvania Superior Court, which affirmed the lower court.

The order to transfer assets to Willa White obviously disappointed Nevin White, who searched for alternatives to such a divestment. Through a fellow lumberman, Nevin White was introduced to a business consultant named Roland Jones and his organization, R.S. Jones Co., Inc. On August 12, 1988, Nevin White gave Jones a general Power of Attorney over his property. (Plaintiff's Exhibit No. 1, Transcript of 10/31/96.) Jones immediately sought out new counsel for Nevin in defending against Willa's claim. Through an ad in a trade publication, Jones was introduced to Benjamin V.R. Conlon, an English barrister attempting to relocate his practice to the United States.

At his initial consultation, Conlon made it clear that contact with White should be strictly avoided and take place entirely through Jones, similar to the way he practiced law with a solicitor in the United Kingdom. (Transcript of 11/1/96 at 10–12 (Doc. # 58).) All bills would be paid through Jones and all inquiries were to take place through Jones. Conlon's retention was allegedly finalized although the terms were never set forth in any written document.

Meanwhile, in the State Court, Judge George Hoffer was administering the White domestic litigation. On May 8, 1992, faced with apparent resistance to the distribution order issued earlier in the proceeding, Judge Hoffer appointed Edward W. Harker, Esq. as "Trustee in Receivership" of the assets of J. Nevin White. Further, he enjoined Nevin White, Roland Jones, or "anyone acting on their behalf," from interfering with the Trustee's performance of his duties. (Exhibit No. B–1, Transcript of 1/21/97.) That same order rescinded earlier transfers by J. Nevin White of stock of the J. Nevin White Lumber Co. as a fraud upon the court.

It was at that point that the jurisdiction of the bankruptcy court was first invoked. On May 11, 1992, J. Nevin White filed a Chapter 11 in the Middle District of Pennsylvania, effectively staying Harker's ad-

ministration. Harker responded with a Motion to Dismiss which was granted by Chief Bankruptcy Judge Robert J. Woodside on June 30, 1992 as "another attempt by J. Nevin White to delay having his wife, who has serious medical problems, receive property to which she is entitled." (Exhibit No. B–2, Transcript of 1/21/97.) Not to be outmaneuvered, eight days later, J. Nevin White Lumber Co. filed for relief under Chapter 11 in the same court to Case No. 1–92–1644. (Exhibit No. B–12, Transcript of 1/21/97.)

The successive filings by White and his company apparently exhausted the patience of Judge Hoffer and, on August 27, 1992, he issued a contempt citation against Nevin White. (Transcript of 11/1/96 at 29.) However, Nevin White was no longer in Pennsylvania. White testified that Conlon and Jones gave him an airplane ticket and told him to go to Canada and call on his "customers." He was told that counsel would represent him at the contempt hearing. (Transcript of 10/31/96 at 131.) On April 7, 1993, White filed a Chapter 13 bankruptcy in the Southern District of Florida to No. 93–11390. The following day, Conlon filed a Suggestion of Bankruptcy in Cumberland County Domestic Court. (Exhibit No. B–4, Transcript of 1/27/97.)

Thereafter, on May 13, 1993, Roland Jones was held in contempt by Judge Hoffer in Cumberland County. (Exhibit No. B–21, Transcript of 1/27/97.) Pursuant to that Order, Jones was incarcerated until he turned over a significant amount of White's assets to Harker as receiver. This, however, did not terminate Jones' involvement in the case. Asserting his interest as a creditor of the missing Nevin White, Jones filed an Involuntary Petition in bankruptcy in the Bankruptcy Court of Vermont on January 10, 1994. (Exhibit No. B–6, Transcript of 1/27/97.) On March 15, 1994, the Vermont case was dismissed. Bankruptcy Judge Conrad specifically found that Jones' filing was done in "bad faith." (Exhibit No. B–7, Transcript of 1/27/97.)

Jones responded by attempting to reopen the Pennsylvania case against the lumber company (Case No. 1–92–01644) by Motion filed March 28, 1994. (Exhibit No. B–12, Transcript of 1/27/97.)

Four (4) months later, in July of 1994, Harker filed a Complaint against White and Conlon in District Court under the Racketeer Influenced and Corrupt Organization Act (RICO).

On October 18, 1994, Conlon filed a Voluntary Petition in bankruptcy for J. Nevin White Lumber Co. in the Middle District of Pennsylvania to Case No. 1–94–01808. Judge Woodside having recused himself, that case was transferred to the Wilkes–Barre division on October 25, 1994 and was thereafter identified as 5–94–01411.

On October 29, 1994, desperately seeking to return to Pennsylvania, White paid a surprise visit to Conlon at Conlon's Elizabethtown, New York residence. While the specifics of that meeting are in dispute, both Nevin White and Conlon agree that Jones was no longer authorized to speak for White and White was unable or unwilling to pay Conlon his requested retainer regarding the bankruptcy or the RICO action. Consistent with a failure to strike an agreement for continued legal services, on November 12, 1994, Conlon wrote to myself and Judge Hoffer attempting to withdraw his appearance in the bankruptcy matter and the domestic litigation, respectively. (Trustee's Exhibit No. 3, Transcript of 11/1/96.)

On December 5, 1994, this Court dismissed the White Lumber Co. case filed October 18, 1994, reserving the sanction issues that were pending against Conlon. On February 5, 1996, Conlon was sanctioned by this Court under the provisions of Federal Rule of Bankruptcy Procedure 9011. (Exhibit No. B–16, Transcript of 1/27/97.)

Seven days later, on February 12, 1996, Conlon filed an Involuntary Petition

against "Edward W. Harker, Esq. Receiver and Custodian of the Assets of J. Nevin White" alleging nonpayment of fees owing Conlon in the amount of $9,758.75 [1]. (Exhibit No. B–20, Transcript of 1/27/97.) It is this Petition that has spawned the sanction motions currently pending before the Court.

The initial hearing on the Harker Petition was held on June 25, 1996. By the end of the day, it became rather apparent that a determination of the extent, if any, to which Nevin White was obligated to Benjamin Conlon under Conlon's retention agreement would play an important role in the ultimate decision of the Court regarding both the disposition of the Involuntary Petition and the requests for sanctions. The Court saw as dispositive the question of whether Edward Harker, as Receiver, had an obligation to pay Conlon as a creditor of Nevin White. The Court opined that Judge Hoffer of the Cumberland County Court overseeing the receivership was best suited to adjudicate that issue. The parties before me appeared to agree. (Transcript of 6/25/96 at 148–149.) Conlon was directed to file an appropriate application to Judge Hoffer within 30 days and the pending matters were suspended.

Conlon never filed that application. Rather, on July 5, 1996, he filed an Involuntary Petition naming John Nevin White as debtor and now asserting that the debt owing him exceeded $50,000. The Petition was filed in the Middle District of Pennsylvania to Case No. 5–96–01417. This filing, predictably, generated a new series of dismissal motions and sanction requests.

By document filed April 5, 1996, Harker is requesting the imposition of sanctions under 11 U.S.C. § 303(i) and Federal Rule of Bankruptcy Procedure 9011. (Attachment to Doc. # 14 at ¶¶ 25 and 26 filed in Case No. 5–96–00241.) See also Doc. # 78.

Willa White has requested the imposition of sanctions under Federal Rule of Bankruptcy Procedure 9011 by Motion filed April 9, 1996 in the Harker case (Doc. # 17.), and in the J. Nevin White case (Doc. # 7 in Case No. 5–96–01417). The United States Trustee has moved for sanctions on April 10, 1996 under Federal Rule of Bankruptcy Procedure 9011 in the Harker case. (See Doc. # 21 at ¶ 9.) The United States Trustee has also requested sanctions in the White proceeding. (Doc. # 4 in Case No. 5–96–01417.)

*Discussion*

■ Section 303(i) of the Bankruptcy Code provides that:

  (i) If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—

    (1) against the petitioners and in favor of the debtor for—

      (A) costs; or

      (B) a reasonable attorney's fee; or

    (2) against any petitioner that filed the petition in bad faith, for—

      (A) any damages proximately caused by such filing; or

      (B) punitive damages.

Having heretofore dismissed both Involuntary Petitions, the option of this Court to assess attorney's fees and/or costs as well as actual and punitive damages against the petitioner, Benjamin V.R. Conlon, suggests that I first determine whether Conlon's filing was done in bad faith.

■ Conlon filed this Petition against Edward Harker, Receiver and Custodian of the Assets of J. Nevin White, as the sole

---

1. On April 20, 1996, Conlon amended his Petition to add to White's obligation to him, sanctions assessed against Conlon in the amount of $7,363.80 since "it was an express term of the agreement that [Conlon] would be indemnified by said J. Nevin White for all costs and sanctions incurred by [Conlon] in the pursuance of his legal representation." (Doc. # 30 at ¶ 2.)

petitioning creditor under 11 U.S.C. § 303(b)(2). Conlon, then a practicing attorney with some bankruptcy experience [2], alleged that J. Nevin White was indebted to him in the amount of $9,758.45. Conlon was aware that the minimum claim against an involuntary debtor must aggregate at least $10,000 [3], but he, nevertheless, filed the Petition. (Transcript of 10/31/96 at 50.) The failure to comply with this basic requirement is, in and of itself, strong evidence of bad faith. Conlon's explanation for such disregard was feeble, at best. He assumed that Roland Jones, as an alleged creditor of White, would have joined him in the Petition, although Conlon was unaware of the basis of Jones' claim. (Transcript of 9/4/96 at 41.) He also thought that sanctions filed against him as White's counsel would supplement the initial claim against White since White "agreed" to indemnify Conlon for any expenses Conlon bore in representing White.

The numerous transcripts reviewed by the Court in preparation for writing this opinion provides significant evidence that Conlon was an intelligent individual with a clear command of the literal requirements of the statute but nonetheless, an invidious desire to manipulate its essential elements for his own selfish purposes. He could have made no possible mistakes with regard to those statutory requirements.

This blatant attempt to involuntarily place White into bankruptcy without the requisite claims was not the only criticism of Conlon's Petition. White's indebtedness was tenuous in spite of the requirement that the underlying obligation cannot be subject to a "bona fide dispute." 11 U.S.C. § 303(b)(1). Equating the lack of a bona fide dispute with the standards for granting summary judgment, our Circuit adopted a definition of bona fide dispute that would include "a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts."

*B.D.W. Assoc. v. Busy Beaver Bldg. Ctrs.,* 865 F.2d 65, 66 (3d Cir.1989) *citing In re Lough,* 57 B.R. 993 (Bankr.E.D.Mich. 1986).

The backdrop of this requirement becomes of critical import when it is realized that Conlon named Harker, in his position as receiver and custodian, as the Debtor in the initial Involuntary Petition. It was, thus, from Harker's perspective, as White's state court Trustee, that the existence of a bona fide dispute must be gauged.

Conlon's activities on behalf of White primarily occurred in a federal forum. As such, Conlon's activities were governed by the Model Rules of Professional Conduct. *Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304, 1316 (3d Cir.1993) *citing County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1407, 1413–1414 (E.D.N.Y.1989), *aff'd,* 907 F.2d 1295 (2d Cir.1990) ("The ethical standards imposed upon attorneys in federal court are a matter of federal law. We look to the Model Rules of Professional Conduct to furnish the appropriate ethical standard."). See also *In re Corn Derivatives Antitrust Litigation,* 748 F.2d 157, 162 (3d Cir.1984) ("We believe that the appropriate guidance for finding the current national standards of ethical norms lies in the standards promulgated by the American Bar Association.... Accordingly, we will apply the principles and rules set forth in the ABA Model Code of Professional Responsibility, and in the recently approved Model Rules of Professional Conduct."). Several of the Model rules articulate procedures clearly at odds with Conlon's relationship to his client, J. Nevin White. For example, Rule 1.5(b) indicates "(b) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation." There was no written

---

**2.** Transcript of 11/1/96 at 32 (Doc. # 58).

**3.** For cases commenced on or after April 1, 1998, the dollar amounts have been raised.

fee agreement arranged with White or Jones as White's attorney-in-fact. (Transcript of 9/4/96 at 20.)

Moreover, Conlon's bankruptcy filing on October 18, 1994 on behalf of J. Nevin White Lumber Co. and his unsuccessful attempt to withdraw as counsel on November 12, 1994 was a gross deviation from acceptable norms of behavior.[4] In fact, Conlon disavowed any obligation attached to his execution of the White bankruptcy petition. See Exhibit "U" of United States Trustee's Motion (Doc. # 25 filed to Case No. 5–96–00241) ("... I have not entered any formal appearance in the Bankruptcy case No. 5–94–01411 ... my only function was limited to the filing of the petition.")

More startling was Conlon's violation of Rule 1.4 which compels communication with a client.[5] Conlon's court testimony emphasized how he wished to isolate himself from any contact with Nevin White in an apparent attempt to immunize himself from any knowledge of White's whereabouts. (Transcript of 11/1/96 at 30 (Doc. # 58).) The record documents rare instances where Conlon actually spoke to White. This takes us to a rather curious deduction based on the facts set forth on the record. Conlon emphasized that, at Conlon's request, he had almost no direct contact with White. Virtually all his consultations regarding White's case were with Roland Jones by virtue of a power of attorney White gave to Jones. In fact, Conlon produced a limited power of attorney to Roland Jones from White dated

August 12, 1988 and signed by "J. Nevin White, Pres." (Exhibit No. P–1, Transcript of 11/1/96.) Jones, however, as President of Roland S. Jones Co., Inc. put White into involuntary bankruptcy in Vermont on January 10, 1994, alleging the nonpayment of a $15,082.96 obligation. (Exhibit No. B–6, Transcript of 1/27/97.) This Involuntary put Jones in clear conflict with his fiduciary duties as attorney-in-fact for White effectively terminating Jones' authority to act on White's behalf. Notwithstanding that development, Conlon continued to hold himself out as White's attorney. See Affidavit of Benjamin V.R. Conlon attached as Exhibit S to United States Trustee's Motion (Doc. # 21 filed to Case No. 5–96–00241). He continued to bill White for the services underlying the claim set out in the Harker Petition. In fact, substantially all of Conlon's claim against Harker as White's custodian was for services rendered between July 1, 1994 and November 12, 1994. (Exhibit No. P–8, Transcript of 11/1/96.) An examination of P–8 appears to indicate that Conlon was billing White for consultations with Jones regarding the Involuntary in Vermont. The obvious implication of this is that the Involuntary was no more than a sham designed to circumvent Judge Hoffer's injunction against Jones interfering with White's assets. Of greater concern to me with regard to this matter is that Benjamin Conlon was very much a part of this ruse. I find this conduct from a then-practicing attorney[6], to be particularly offensive and reprehensible.

---

**4.** "An agreement may not be made whose terms might induce the lawyer improperly to curtail services for the client or perform them in a way contrary to the client's interest. For example, a lawyer should not enter into an agreement whereby services are to be provided only up to a stated amount when it is foreseeable that more extensive services probably will be required, unless the situation is adequately explained to the client. Otherwise, the client might have to bargain for further assistance in the midst of a proceeding or transaction." Model Rules of Professional Conduct Rule 1.5 cmt. (1987)

**5.** RULE 1.4 COMMUNICATION

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Model Rules of Professional Conduct Rule 1.4 cmt. (1987)

**6.** In a later proceeding, unrelated to this matter, Conlon advised the Court that he had subsequently been disbarred by the State of New York.

Conlon further argues that White agreed to "indemnify Conlon for Sanctions issued against Conlon in representing White." Even if such an agreement did exist, it likely would be challenged as against public policy. *Harb v. Gallagher,* 131 F.R.D. 381, 390 (S.D.N.Y.1990).

Conlon's activities, together with the lack of any written fee agreement, compel a finding that there was ample reason for Harker to challenge Conlon's fee. All the elements of a bona fide dispute were present.

Not as yet addressed is the rather unusual step of filing this Involuntary, not against White, the alleged obligor, but against Harker as "Receiver and Custodian of the Assets of J. Nevin White."

Harker complains that such a filing was mean-spirited and has unfairly impacted his personal creditworthiness. He has supported this argument with his personal credit reports referencing this bankruptcy. He has testified that the filing has been a source of embarrassment to himself and his family, especially considering his status as a practicing attorney.

■ Section 303 of the Bankruptcy Code identifies, with limited exceptions, that any person qualifying under the chapter at issue may be the subject of an involuntary petition. My research does not appear to disqualify an individual serving as a "Trustee in Receivership" from either filing or being subject to a petition in bankruptcy. The Petition clearly identifies Harker only in his capacity as "Receiver and Custodian of the Assets of J. Nevin White." I can only conclude that naming Harker as such is not, in and of itself, sanctionable. Nevertheless, the testimony was consistent from both Harker and Conlon that Conlon never made demand on Harker to pay the alleged bill for legal services. Without such a demand, Conlon should have known that he could not possibly meet the requirements of § 303(h)(1), which necessitates proof that the debtor is generally not paying his debts as they become due. This finding evidences further Conlon's bad faith in filing the Petition.

The conclusion is inescapable that Conlon filed the Involuntary Petition in bad faith and, thus, should be responsible to Harker for all costs, reasonable attorney's fees, actual damages, and punitive damages as provided for by 11 U.S.C. § 303(i)(1) and (2).

Before assessing punitive damages, I believe it appropriate to analyze the Rule 9011 issues advanced by the parties.

Before the 1997 amendment, Rule 9011(a) stated:

(a) Signature

Every petition, pleading, motion and other paper served or filed in a case under the Code on behalf of a party represented by an attorney, except a list, schedule, or statement, or amendments thereto, shall be signed by at least one attorney of record in the attorney's individual name, whose office address and telephone number shall be stated. A party who is not represented by an attorney shall sign all papers and state the party's address and telephone number. The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation or administration of the case. If a document is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the person whose signature is required. If a document is signed in violation of this rule, the court on motion or on its own initiative, shall impose on the person who signed it, the

represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including a reasonable attorney's fee.

My first consideration is whether either Involuntary Petition was "well grounded in fact and ... warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law."

Cases under the similar Federal Rule of Civil Procedure 11 are helpful in analyzing the disposition of cases under Federal Rule of Bankruptcy Procedure 9011 since both rules advance the same policies. *Landon v. Hunt,* 977 F.2d 829, 833 at n. 3 (3rd Cir.1992).

Rule 11 "imposes on any party who signs a pleading, motion, or other paper—whether the party's signature is required by the Rule or is provided voluntarily—an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing, and that the applicable standard is one of reasonableness under the circumstances." *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* 498 U.S. 533, 551, 111 S.Ct. 922, 933, 112 L.Ed.2d 1140 (1991). "[T]he central purpose of Rule 11 is to deter baseless filings in district court and thus, consistent with the Rules Enabling Act's grant of authority, streamline the administration and procedure of the federal courts." *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 393, 110 S.Ct. 2447, 2454, 110 L.Ed.2d 359 (1990). Unlike the imposition of certain other sanctions, a party advancing a request under Rule 9011 must show only "objectively unreasonable conduct." *Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc.,* 57 F.3d 1215, 1225 (3rd Cir.1995).

As discussed in conjunction with the § 303(i) penalties, the initial Petition, alleging an obligation of $9,758.45, was clearly at odds with the statutory requirement of a minimum debt of $10,000.00.

During the course of the proceedings, Conlon argued legal theories that the $10,000.00 threshold was not mandatory, and that it was acceptable to file such a Petition as long as the petitioner could anticipate others joining with the proponent to cumulatively meet the minimum debt. Conlon advanced no legal support for these arguments. In fact, the Court doubts whether any legal research was performed prior to the filing of the Involuntary Petitions against Harker and White.

Moreover, no evidence was submitted by Conlon that White was aware of an unpaid claim and no demand against either White or Harker was evidenced on this record. Had such a demand been made, there was ample evidence that the claim would have been the subject of a "bona fide dispute," as heretofore indicated.

The then-recent history of sanctions imposed on Conlon at Harker's behest provides significant evidence that Conlon's motive for filing against Harker was either his desperate need to acquire funds to address these sanctions, a desire to delay the proceedings against him or, regrettably, to exact some degree of revenge from Harker. The history of the Harker–Conlon relationship would suggest the latter.

On August 23, 1994, Judge Franklin S. Billings, Jr. of the District Court of Vermont sanctioned Conlon for filing a frivolous appeal. He ordered Conlon to pay Harker $1,000.00. (Exhibit No. B–11, Transcript of 1/27/97.) The sanction was never paid.

On February 5, 1996, this Court sanctioned Conlon and ordered him to pay attorney's fees and costs to Harker as well as counsel to Willa White. (Trustee's Exhibit No. 5, Transcript of 11/1/96 and Exhibit No. B–16, Transcript of 1/27/97.) Seven days later, Conlon filed the Involuntary against Harker.

I am satisfied that Rule 9011 sanctions are in order. I hereby award reasonable costs, expenses and attorney's fees in favor of Edward Harker, Esq., the United States Trustee, and Counsel for Willa

White, in regard to both Involuntary Petitions. An itemization of such costs and fees shall be filed of record and served within fifteen (15) days of the date of this decision. Conlon shall have ten (10) days thereafter to register an objection to that itemization and request a hearing.

In considering the award of punitive damages under 11 U.S.C. § 303(i)(2), the Collier treatise offers the following guidance in measuring the size of the allowance.

> According to some courts, punitive damages must bear a reasonable relationship to the injury inflicted and its cause, and in making the assessment courts should consider, among other factors, the nature, extent and enormity of the award, the intent of the person committing the wrong and any mitigating circumstances, including the ability of the wrongdoer to pay. Other courts assert that the award should also be tailored in light of other damage awards in the same case so as not to produce an unduly harsh result.

2 Lawrence P. King, Collier on Bankruptcy ¶ 303.15[5][b] at 303–95 (15th ed. rev. 1999).

Since this Opinion directs the filing of an itemization of attorneys' fees etc., my award of punitive damages shall be deferred until the final judgment in this case.

Conlon's filing of these Petitions was done *pro se*, on his own behalf. In advancing these Petitions, he has demonstrated a flagrant abuse of the legal machinery as well as an unenviable talent for manipulating the facts. Indeed, invocation of the Rule 9011 mechanism to deter such frivolous filing is mandated by these circumstances.

■ The mere fact that Conlon's participation in the two Petitions was on his own behalf and not as counsel, should not insulate him from appropriate sanctions upon

his ability to practice law. The request to enjoin Conlon from practice, however, has been mooted by his disbarment by the State of New York. Nevertheless, should his reinstatement be requested, I recommend that further practice should depend on a demonstration by Conlon of a working knowledge of the Model Rules of Professional Conduct. I so conclude because Conlon's disregard for the customary standards of practice in this country bespeak either unbridled gall or vast ignorance. The record before me can support no other conclusion.

In reaching this determination, I am satisfied Conlon has received sufficient notice to comport with the requirements of due process.[7]

An Order will follow.

---

7. "The party sought to be sanctioned is entitled to particularized notice including, at a minimum, 1) the fact that Rule 11 sanctions are under consideration, 2) the reasons why sanctions are under consideration, and 3) the form of sanctions under consideration." *Simmerman v. Corino*, 27 F.3d 58, 64 (3rd Cir.1994) *citing Gagliardi v. McWilliams*, 834 F.2d 81, 82–83 (3d Cir.1987).